HAWKINS v MERCY HEALTH SERVICES, INC

Docket No. 200563. Submitted March 12, 1998, at Grand Rapids. Decided
    June 16, 1998, at 9:05 A.M.

    Bonita and Ray Hawkins brought an action in the Wexford Circuit
        Court against Mercy Health Services, Inc., alleging that the defend-
        ant defamed Bonita Hawkins in two press releases and in a Cadil-
        lac Mercy Hospital memorandum. The plaintiffs alleged that the
        press releases and the memorandum falsely implied that Bonita
        Hawkins' employment at the hospital ended because of her involve-
        ment in a medication overdose that led to a patient's death. The
        plaintiffs alleged that Bonita Hawkins chose to resign rather than
        be fired after hospital officials accused her of lying about criticiz-
        ing the physician involved in the overdosing incident in conversa-
        tions with co-workers. The court, Charles D. Corwin, J., granted
        summary disposition for the defendant on the basis of the substan-
        tial truth defense. The court concluded that the implication flowing
        from the press releases and the memorandum was substantially
        true and therefore not actionable. The plaintiffs appealed.

        The Court of Appeals *held*:

        1. The trial court correctly determined that summary disposition
        based on the substantial truth doctrine may be granted even where
        there is a genuine issue of fact regarding whether the alleged
        defamatory statement was made negligently or intentionally. Mate-
        rial falsity of the alleged defamatory statement and fault of the
        maker of the statement involve separate, distinct, and independent
        determinations.

        2. The trial court erred in granting summary disposition on the
        basis of the substantial truth doctrine. Although the statements
        made in the press releases and in the memorandum were literally
        true, the press releases and the memorandum nevertheless falsely
        implied that Bonita Hawkins ceased to be employed at the hospital
        because of involvement in the fatal overdosing incident.

        Reversed and remanded for further proceedings.

1. LIBEL AND SLANDER — LIBEL — ELEMENTS.

    The four components of a cause of action for libel are a false and
        defamatory statement concerning the plaintiff, an unprivileged
        communication to a third party, fault amounting to at least negli-

gence on the part of the publisher, and either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

2. LIBEL AND SLANDER — DEFAMATION BY IMPLICATION.

A cause of action for defamation by implication exists in Michigan; a plaintiff alleging defamation by implication must prove that the defamatory implication is materially false; such a cause of action can be successful even without a direct showing of a literally false statement.

3. LIBEL AND SLANDER — DEFENSES — SUBSTANTIAL TRUTH.

A defendant is not liable for libel where the gist of the article or the sting of the charge is substantially true.

4. LIBEL AND SLANDER — FALSITY OF STATEMENT — FAULT OF MAKER.

Separate, distinct, and independent determinations are to be made with respect to the material falsity of an alleged defamatory statement and the fault of the maker of the statement; summary disposition for a defendant based on the substantial truth defense may be granted even where there exists a genuine issue of fact concerning whether the alleged defamatory statement was made negligently or intentionally.

5. LIBEL AND SLANDER — DEFAMATION BY IMPLICATION — DEFENSES — SUBSTANTIAL TRUTH.

Substantial truth is a defense to an action for defamation by implication.

*Kaufman and Payton* (by *Jeffrey K. VanHattum*), for the plaintiffs.

*Miller, Johnson, Snell & Cummiskey, P.L.C.* (by *Jon G. March* and *Lori J. Stich*), for the defendant.

Before: MARKEY, P.J., and GRIFFIN and WHITBECK, JJ.

WHITBECK, J. In this defamation action, plaintiffs appeal as of right an order granting summary disposition to defendant pursuant to MCR 2.116(C)(10). We reverse and remand.

I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A. THE EVENTS OF MAY 22-MAY 23, 1995

On the night of May 22, 1995, plaintiff Bonita Hawkins, a nurse, was working in the intensive care unit of Cadillac Mercy Hospital, which is operated by defendant Mercy Health Services, Inc. The intensive care unit is located next to the hospital's "step-down" unit. At some point during that evening, another nurse, Cindy Hall, came to the intensive care unit to obtain medication to be administered to Phyllis L. Shimel, a patient in the step-down unit. Shimel was under the care of Dr. Merrilee Brandt. While at Shimel's bedside, Dr. Brandt had written an order for 2.5 milligrams of esmolol hydrochloride, the trade name for which is Brevibloc. Brevibloc is used to reduce a patient's heart rate.

According to Hawkins, Hall told her that Hall "needed 2.5 grams of Brevibloc for Dr. Brandt." Hawkins went with Hall to the medication room to find the medication. At her deposition, Hawkins testified that "I located it in its drawer and pulled it out." Hawkins further testified: "We both looked at the label. I said, 'This is 2.5 grams of Brevibloc. Is this what you want?' and [Hall] . . . said, 'Yes.'" Hawkins did not read the entire label of the 2.5 gram ampoule of Brevibloc that states, in bold letters: "NOT FOR DIRECT IV INJECTION MUST BE DILUTED BEFORE USE." Hawkins then filled a syringe with 2.5 grams of Brevibloc and gave the syringe to Hall, who returned to the step-down unit.

Hawkins later observed on Shimel's heart monitor (heart monitors for patients in the step-down unit, including Shimel, were located in the intensive care unit) that Shimel's heart rate was still elevated. Haw-

kins then went to Shimel's room, where she met Hall and Dr. Brandt. Hawkins testified in her deposition that she then asked Dr. Brandt if the medication Dr. Brandt and Hall had obtained was the one that Dr. Brandt wanted. According to Hawkins, Dr. Brandt said, "Yes, that's what I want." Hawkins testified that she then told Dr. Brandt that the syringe contained 2.5 grams of Brevibloc and asked, "Is this what you wanted?" According to Hawkins, Dr. Brandt responded, "Yes." Hawkins testified that she was told by Dr. Brandt to administer the medication, which Hawkins did.

The dosage administered by Hawkins to Shimel was incorrect; the correct dosage was 2.5 *milligrams* of Brevibloc, not 2.5 *grams*. Following the administration of the drug, Shimel's heart rate slowed drastically, she suffered cardiac arrest, and she lapsed into a coma. After approximately thirty minutes, Shimel was transferred to the intensive care unit. Shimel died on May 23, 1995.

### B. THE CONVERSATIONS CONCERNING DR. BRANDT

Following Shimel's transfer to the intensive care unit, Hawkins spoke with Matt Long and Jan Olsen,[1] two other nurses working in the intensive care unit on the evening of May 22, 1995. During that conversation, Hawkins and the two other nurses criticized Dr. Brandt's handling of Shimel's care. These comments were overheard by members of Shimel's family, one of whom complained to officials of the hospital on May 23, 1995. When asked by hospital officials, Hawkins denied having made the remarks about Dr.

---

[1] We note that differing spellings of this surname are used in the parties' briefs and the lower court record.

Brandt. However, Long and Olsen both admitted that the conversation had taken place.

### C. THE TERMINATION/RESIGNATION OF HAWKINS

When she was informed that she would be terminated because she had lied about the May 23, 1995, conversation with Long and Olsen, Hawkins requested that she be allowed to resign instead. The hospital's "Determination of Disciplinary Action" stated:

> Nature of Offense: HR Guideline # 810/316. Falsification by commission or omission re: information provided during investigation of patient/family incident.
>
> Employer Statement: Bonnie denied her participation in discussion held at nurses (sic) station regarding physician practice on the night of May 22 → AM of May 23, 1995. Witnessed by family and confirmed by 2 RN peers.
>
> Corrective Action Recommended: Termination effective 6-2-95
>
> Discipline Imposed: (Check one) Employee made decision to resign eff 6-2-95.

Mary Powers, Hawkins' supervisor and the person who signed the Determination of Disciplinary Action as imposing the discipline, testified in her deposition that the basis for Hawkins' termination was "the comments [she] made at the nursing station and the hospital determination that [she] didn't tell the truth about those comments." In particular, Powers testified:

> *Q.* Okay. And the basis for the difference in discipline between the verbal warnings given to Jan Olson [sic] and Matt Long and the written warning given to Jan Olson—the basis between—the difference between that discipline and the discipline—the decision to terminate Bonnie Hawkins

was that Jan Olson and Matt Long admitted to the conversation that occurred at the nurses' station; correct?

A. Correct.

Q. Okay. And there's no other basis for the distinction—in that discipline, that you're aware of, is there? That is the basis; correct?

A. That's correct.

Similarly, in its brief, the hospital states that "because plaintiff had denied making comments in the presence of the patient's family about Dr. Brandt, hospital officials concluded they could no longer trust plaintiff and therefore determined to terminate her employment."

Long and Olsen both received warnings for their involvement in the May 23, 1995, conversation. Hall received a three-day suspension, apparently because of her involvement in the medication dosage error.

### D. PUBLICATION BY THE HOSPITAL

Following Shimel's death and upon receipt of inquiries from the media, the hospital issued two press releases addressing the incident. The first press release (the "May 31, 1995, release") stated:

On Monday, May 22, the patient was admitted to our special care unit for the treatment of septic shock. The patient had had a lengthy illness prior to this particular admittance.

While the patient was being cared for by two registered nurses and a physician, there appears to have been an inappropriate dosage of medication administered.

The pharmaceutical company indicates that an inappropriate amount of this particular medication would normally cause lower blood pressure, drowsiness, and/or loss of consciousness.

The patient was placed on life support in response to her overall medical condition.

> The patient expired the afternoon of Tuesday, May 23.
>
> The autopsy report indicates that the patient died of a thrombotic occlusion, which is a medical term for a blood clot.

The matter received front page coverage in the *Cadillac Evening News* on June 1, 1995, and the media thereafter pursued the story. In particular, the media wanted to know the results of the hospital's investigation into the incident, which employees and physicians were involved, and what action had been taken regarding them. The hospital then issued the second press release (the "June 2, 1995, release") that stated:

> As of today, interviews from hospital personnel and physicians regarding this incident and a review of the medical records have been referred to the hospital's Medical Staff Credentials Committee in accordance with Medical Staff by-laws.
>
> The Credentials Committee will perform an evaluation of this patient's medical care.
>
> Our administration has also instituted disciplinary action. In accordance to [sic] our employee disciplinary policies and procedures, one employee is no longer with the hospital. Another employee has received an appropriate disciplinary action.
>
> Circumstances regarding this incident have been communicated to appropriate regulatory, accrediting and licensing agencies.
>
> As we move forward we will insure through all appropriate methods that quality medical care is delivered to this community.

The press releases were drafted as a group effort by the chief executive officer, the chief operating officer, the director of community relations, the risk manager, the director of critical care, the attorney for the hos-

pital, and several members of a public relations firm hired by the hospital.

### E. THE HAWKINS COMPLAINT

Hawkins initiated this lawsuit with the filing of her complaint on October 12, 1995, in which she alleged that the hospital had published false and defamatory statements that conveyed that she "was discharged from her employment with Defendant because of Plaintiff's actions in administering a drug to a patient at the hospital, which resulted in the death of the patient."[2] Hawkins in her complaint identified the allegedly defamatory statement as (1) the May 31, 1995, release; (2) the June 2, 1995, release; (3) a June 2, 1995, intrahospital memorandum, the text of which is identical to the June 2, 1995, release; (4) a letter of June 19, 1995, from the hospital to the director of the Michigan Office of Health Services; and (5) statements made on behalf of the hospital to the *Cadillac Evening News* on or about June 1 and June 3, 1995. The focus of this appeal is on the May 31, 1995, release, the June 2, 1995, release, and the June 2, 1995, memorandum.

### F. RULINGS ON SUMMARY DISPOSITION.

On October 21, 1996, the hospital moved for summary disposition pursuant to MCR 2.116(C)(10), arguing that the statements contained in "the press releases, internal memorandum, and related statements . . . are literally true, and the implications of those statements . . . are so substantially true that the plaintiff has no claim as a matter of law." The hospital

---

[2] Hawkins' husband, Raymond Hawkins, was later added as a plaintiff, but his claim is purely derivative.

also asserted that the "statements in the letter of June 19, 1995 are . . . privileged."

On November 12, 1996, the circuit court granted the hospital's motion with respect to the June 19, 1995, letter but denied it with respect to the other cited statements. The circuit court reasoned that, in the absence of any controlling Michigan case law, the applicability of the substantial truth doctrine to a situation where there is a genuine dispute concerning whether a defendant intentionally published misstatements is questionable. The circuit court concluded by stating: "I find that the rationale behind the substantial truth doctrine is somewhat diminished . . . if it can be shown that the hospital intentionally did this in a way to make them [sic] look good . . . with the public."

However, in response to the hospital's motion for reconsideration, on December 11, 1996, the circuit court concluded that it had erred in previously failing to apply the substantial truth doctrine because of its misgivings that the doctrine applied given that there was a genuine issue regarding whether the hospital had intentionally published misstatements about Hawkins. The circuit court concluded:

> In addition to defendant's Motion for Reconsideration and the accompanying Brief, the Court has once again reviewed defendant's original motion and brief, plaintiff's response and brief, defendant's reply brief and the authority cited in the briefs. The Court has specifically revisited the Michigan Supreme Court cases of *Locricchio* v *Evening News Ass'n,* 438 Mich 84; 476 NW2d 84 (1991) and *Rouch* v *Enquirer & News of Battle Creek,* 440 Mich 238; 487 NW2d 205 (1991). From a review of all of the foregoing, the Court finds that it erred in it's [sic] previous ruling, and defendant should be

entitled to summary disposition based upon the "substantial truth doctrine."

It is clear that the Michigan Supreme Court in *Rouch* determined that the issue of fault, i.e. whether the statement at issue was made negligently or intentionally, is independent of the question of material falsity to which the "substantial truth doctrine" is applicable.

The circuit court therefore granted summary disposition with respect to all of Hawkins' claims.

## II. STANDARD OF REVIEW

We review a trial court's grant or denial of a motion for summary disposition de novo. *Carlyon v Mut of Omaha Ins Co*, 220 Mich App 444, 446; 559 NW2d 407 (1996). When reviewing a motion for summary disposition brought pursuant to MCR 2.116(C)(10), we consider all documentary evidence available to us in a light most favorable to the nonmoving party in order to determine whether there is a genuine issue with respect to any material fact. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996).

## III. CONCEPTUAL OVERVIEW

### A. THE ELEMENTS OF DEFAMATION

Michigan law has traditionally defined a defamatory communication as one which " ' "tends so to harm the reputation of [persons so] as to lower [them] in the estimation of the community or to deter [others] from associating or dealing with [them]." ' " *Locricchio v Evening News Ass'n*, 438 Mich 84, 115; 476 NW2d 112 (1991), quoting with approval *Nuyen v Slater*, 372 Mich 654, 662, n *; 127 NW2d 369 (1964) (citation

omitted).[3] A cause of action for libel has four components: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Locricchio, supra* at 115-116, cited with approval in *Rouch v Enquirer & News of Battle Creek (After Remand)*, 440 Mich 238, 251; 487 NW2d 205 (1992). See also *DeFlaviis v Lord & Taylor, Inc*, 223 Mich App 432, 443-444; 566 NW2d 661 (1997); *Northland Wheels Roller Skating Center, Inc v Detroit Free Press, Inc*, 213 Mich App 317, 323; 539 NW2d 774 (1995). "A cause of action for libel requires a plaintiff to show defamatory meaning as well as falsity, fault, and publication." *Locricchio, supra* at 116.

The waters, however, become considerably muddier when one ventures beyond these broad common-law principles. Generally speaking, a litigant alleging defamation or libel must additionally overcome certain constitutional barriers to such claims. As recognized in *Locricchio* and *Rouch*, analysis under the constitution has focused on three elements: the public- or private-figure status of the plaintiff, the media or nonmedia status of the defendant, and the public or private character of the speech. *Rouch, supra* at 251-252; *Locricchio, supra* at 118. In addition, as this

---

[3] See also 3 Restatement Torts, 2d, § 559, p 156, quoted with approval in *Rouch v Enquirer & News of Battle Creek (After Remand)*, 440 Mich 238, 251; 487 NW2d 205 (1992):

A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

case illustrates, a fourth element may be involved and
that is whether it is the statements *themselves* or the
*implications* that may be drawn from such state-
ments that are alleged to be false. Thus, in matrix
form, the following elements may be involved in a
defamation case:

| Type of Plaintiff | Type of Defendant | Character of the Speech | Type of Statement |
|---|---|---|---|
| Public Figure | News Media | Matters of Public Concern | Statements true/ implications true |
| Private Figure | Nonmedia | Matters of Private Concern | Statements true/ implications false |
| | | | Statements false/ implications true |
| | | | Statements false/ implications false |

As is readily apparent, depending on the underlying
facts, a bewildering number of possibilities may be
involved in a given defamation action. It is well,
therefore, to keep the particular facts of this case in
mind. Here, we have a private-figure plaintiff, Haw-
kins, suing a nonmedia defendant, the hospital, over
statements relating to a matter of public concern, the
death of a patient at the hospital following the inap-
propriate administration of medication. Further, Haw-
kins does *not* appear to assert that the statements in
the May 31, 1995, release, the June 2, 1995, release,
and the June 2, 1995, memorandum were, when read
literally, untrue.[4] It is literally true that, as stated in

---

[4] We use the term "appear" because Hawkins' brief on appeal contains
a number of passages that can be read as assertions that the statements
*themselves* were false. However, Hawkins' counsel during oral argument
conceded that the statements in the May 31, 1995, release, the June 2,
1995, release, and the June 2, 1995, memorandum were, when read liter-
ally, true.

the May 31, 1995, release, "[w]hile the patient [Shimel] was being cared for by two registered nurses [Hawkins and Hall] and a physician [Dr. Brandt], there appears to have been an inappropriate dosage of medication administered." Further, it is literally true that, as stated in the June 2, 1995, release and the June 2, 1995, memorandum, the hospital "instituted disciplinary action" (against Hawkins, as shown in the Determination of Disciplinary Action), that "one employee [Hawkins] is no longer with the hospital" and that "[a]nother employee [apparently Hall] has received an appropriate disciplinary action."

Rather, Hawkins appears to assert that (1) the *implication* of the hospital's statements is that Hawkins employment was terminated for her actions in providing professional care and that (2) the further *implication* is that Hawkins was incompetent to provide such care. While Hawkins' termination/resignation certainly grew out of her inappropriate dosage of Brevibloc to Shimel, a jury could find that the first implication of the hospital's statements is literally false because, as the hospital's own records show, Hawkins was actually allowed to resign in lieu of being terminated for giving false statements during an investigation. Similarly, while the issue of Hawkins "incompetence" or "negligence" is a mixed question of fact and law, a jury could find the second implication to be literally false as well.[5]

---

[5] The hospital asserts that Hawkins admitted in her deposition, at pages 125-127, that she was partly responsible for the improper dosage of medication, that she was "negligent" by failing to read the entire warning label for the Brevibloc, that she was "negligent" when she failed to read the Brevibloc protocol, and that she was "negligent" by failing to read Dr. Brandt's written orders. However, these pages from Hawkins' deposition testimony are not in the lower court record. Indeed, the hospital has not

We pause to emphasize, therefore, that as did *Locricchio* and *Rouch*, this case involves a private-figure plaintiff and matters of public concern. However, unlike *Locricchio* and *Rouch* this case does not involve a news media defendant. Further, again unlike *Locricchio*[6] and *Rouch*,[7] this case does not involve a situation in which the statements at issue were in the main accurate, although arguably marred by minor inaccuracies. See, e.g., *McCracken v Evening News Ass'n*, 3 Mich App 32, 40; 141 NW2d 694 (1966). Here, the statements were literally accurate. Hawkins' contention is that the *implication* of the statements was

---

even provided this Court with a copy of those pages. Accordingly, we may not consider this alleged testimony by Hawkins. See *Taylor v Blue Cross & Blue Shield of Michigan*, 205 Mich App 644, 654; 517 NW2d 864 (1994) (where a party did not provide pertinent deposition testimony, issue considered abandoned on appeal). In any event, even if these apparent statements by Hawkins in her deposition were properly before us, we would not need to rule with respect to whether these statements constituted admissions of negligence in the legal sense of the term or whether Hawkins, under these particular circumstances, was in a position to evaluate her own conduct with respect to negligence in the legal sense.

[6] See *Locricchio, supra* at 130:

The plaintiffs' primary claim is that the Pine Knob series as a whole falsely implied that plaintiffs were members or associates of organized crime. Although the plaintiffs initially declined to provide any specific allegations of falsity, they argue on appeal that the layout of the Pine Knob articles, including photographs and headlines, as well as the repetition of certain words such as "Mafia," "Sicilian," and "money wash," and indeed certain specific statements, contribute to the overall implication.

[7] See *Rouch, supra* at 260:

The substantial truth doctrine is frequently invoked to solve two recurring problems: minor inaccuracies and technically incorrect or flawed use of legal terminology. This case raises both questions.

The Supreme Court went on to find that, although there were minor differences between the statements in the newspaper article at issue in *Rouch* and the literal truth, the "gist or sting" of the article was not changed by these minor differences. *Id.* at 262.

false and defamatory. Thus, under the matrix, we have a case in which the statements were literally true but the implications were arguably false.

### B. DEFAMATION BY IMPLICATION

Michigan common law recognizes defamation by implication albeit in a somewhat circumscribed fashion. In *Locricchio*, Justice BRICKLEY, writing for the majority, noted that this Court recognized that a number of cases "have held that a cause of action exists for defamation by implication." *Locricchio, supra* at 123. Justice BRICKLEY went on to state, however, that the cases this Court relied on "bear little relation to the case presented here." *Id.* Justice BRICKLEY concluded his analysis of the cases cited by the plaintiffs by observing:

> In any event, the questions whether a statement is capable of rendering a defamatory implication and whether, in fact, a plaintiff has proved falsity in an implication are separate inquiries. *A plaintiff alleging defamation by implication must still prove material falsity.* To do otherwise would allow a plaintiff to recover without a showing of falsity, in contravention of the rule announced in *Hepps.* [*Philadelphia Newspapers, Inc v Hepps*, 475 US 767; 106 S Ct 1558; 89 L Ed 2d 783 (1986)]. Our review of the plaintiffs' proofs, conducted below, convinces us that the plaintiffs failed to make such a showing. [*Locricchio, supra* at 130 (emphasis supplied).]

This statement should be read in conjunction with Justice BRICKLEY's earlier observation:

> As will be seen, we do not, and need not, disagree in theory with the conclusion of the Court of Appeals that a cause of action for libel by implication might succeed *without a direct showing of false statements.* We do disagree with its failure to conduct a review of the sufficiency of the

evidence of falsity for any such libel by implication, as did the trial court. [*Id.* at 123, n 32 (emphasis supplied).][8]

Thus, one may conclude from Justice BRICKLEY's opinion that (1) a cause of action for defamation by implication exists in Michigan, but only if the plaintiff proves that the defamatory *implications* are materially false, and (2) that such a cause of action might succeed even without a direct showing of any actual literally false *statements.*[9] This conclusion is strengthened by Justice BRICKLEY's statement at the outset in *Locricchio* that the Court simply held that "plaintiffs failed to carry their burden of proving *either* false and defamatory factual statements *or false implications.*" [*Id.* at 90-91 (emphasis supplied).]

---

[8] Justice BRICKLEY earlier summarized the cases on which this Court relied: *Sanders v Evening News Ass'n*, 313 Mich 334, 340; 21 NW2d 152 (1946); *Caldwell v Crowell-Collier Publishing Co*, 161 F2d 333, 335-336 (CA 5, 1947), and *Memphis Publishing Co v Nichols*, 569 SW2d 412, 419-420 (Tenn, 1978). According to Justice BRICKLEY:

> From *Sanders*, the Court of Appeals extracted the maxim that " '[t]o test its libelous quality, a publication is to be considered as a whole, including the character of the display of its headlines when the article is published in a newspaper, and the language employed therein.' " *Id.* at 340. From *Caldwell* and *Nichols*, the Court of Appeals extrapolated the proposition that "[i]nsinuation, imputation or inference may be as defamatory as a direct, unveiled assertion." Having thus affirmed the theoretical validity of a cause of action for defamation by implication, the Court of Appeals held that "[t]he pleadings have given rise to a genuine issue of material fact which is to be left to the trier of facts and cannot be disposed of by summary judgment," and remanded the case for trial. [*Locricchio, supra* at 100.]

[9] But see Justice BRICKLEY's observation that "[o]ur review has disclosed no case where a plaintiff prevailed by alleging defamation by implication without a showing of either direct or underlying material falsity, or a material omission of true facts." *Locricchio, supra* at 133, n 41. We have located no reported decision of this Court or the Michigan Supreme Court after *Locricchio* in which a plaintiff has ultimately prevailed on a claim of defamation by implication.

It remains true, however, that claims of defamation by implication, which by nature present ambiguous evidence with respect to falsity, face a severe constitutional hurdle. *Id.* at 122.[10] Principles of general libel and First Amendment libel law continue to apply. *Id.* at 132. Further, Michigan libel law prohibits libel liability "for *true speech*[11] on matters of public concern." *Id.* at 121 (emphasis supplied). See also *Royal*

---

[10] We note, however, that Justice BRICKLEY here cited *Hepps, supra.* *Hepps* involved a private-figure plaintiff suing a news media defendant. Here, of course, we have a nonmedia defendant. However, *Hepps* also involved "speech of public concern." *Hepps, supra* at 768-769. Thus, the "constitutional hurdle" referred to by Justice BRICKLEY is also present in this case. In a defamation-by-implication suit involving a matter of public interest, but a private-figure plaintiff, Justice BRICKLEY, writing for the majority in *Locricchio*, determined that the plaintiff "must still prove material falsity." *Locricchio, supra* at 130. However, such a private-figure plaintiff does *not* have to meet the "actual malice" standard of *New York Times Co v Sullivan*, 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964). *Locricchio, supra* at 129-130. Under the actual malice standard, a public-figure plaintiff must prove by clear and convincing evidence that a defamatory statement was made with knowledge that it was false or with reckless disregard of whether it was false. *Masson v New Yorker Magazine, Inc*, 501 US 496, 510; 111 S Ct 2419; 115 L Ed 2d 447 (1991).

[11] The reference to "true speech" incorporates the concept that some conduct that constitutes speaking or communicating in a physical sense does not constitute "speech" in the constitutional sense of the term. Blatantly and intentionally false representations of simple facts do not constitute "true speech":

At best, it can be said that the [United States Supreme] Court has struggled analytically to balance private reputational interests against public free expression in the context of falsity. *On the one hand the Court* [in *Hustler Magazine, Inc v Falwell*, 485 US 46, 52; 108 S Ct 876; 99 L Ed 2d 41 (1988)]*has asserted that "[f]alse statements of fact" are constitutionally valueless because such statements "interfere with the truth-seeking function of the marketplace of ideas, and they cause damage to an individual's reputation that cannot easily be repaired by counterspeech, however persuasive or effective."* On the other hand, the Court has also asserted that "[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters." [*Gertz v Robert Welch, Inc*, 418 US 323, 341; 94 S Ct 2997; 41 L Ed 2d 789 (1974).][*Locricchio, supra* at 121 (emphasis supplied).]

*Palace Homes, Inc v Channel 7 of Detroit, Inc,* 197
Mich App 48, 52; 495 NW2d 392 (1992).

### C. THE SUBSTANTIAL TRUTH DEFENSE

As stated in *Rouch*:

> The common law has never required defendants to prove
> that a publication is literally and absolutely accurate in
> every minute detail. For example, the Restatement of Torts
> provides that "[s]light inaccuracies of expression are imma-
> terial provided that the defamatory charge is true in sub-
> stance." Michigan courts have traditionally followed this
> approach. At early common law, Michigan courts predi-
> cated a claim for libel on the question whether the article
> was substantially true. In *McAllister v Detroit Free Press
> Co,* 85 Mich 453; 460-461; 48 NW 612 (1891), this Court
> explained that liability could not be imposed for a slight
> inaccuracy:
>
> "It is sufficient for the defendant to justify so much of the
> defamatory matter as constitutes the sting of the charge,
> and it is unnecessary to repeat and justify every word of the
> alleged defamatory matter, so long as the substance of the
> libelous charge be justified. . . . [A] slight inaccuracy in one
> of its details will not prevent the defendant's succeeding,
> providing the inaccuracy in no way alters the complexion of
> the affair, and would have no different effect on the reader
> than that which the literal truth would produce. . . . "
>
> Thus, the test looked to the sting of the article to deter-
> mine its effect on the reader; if the literal truth produced
> the same effect, minor differences were deemed immaterial.
> [*Rouch, supra* at 258-259.][12]

As Justice BRICKLEY observed for the majority in *Locricchio,* "The Holme-
sian concept of the 'marketplace of ideas' plays a central role in all First
Amendment jurisprudence." *Id.* at 121, n 29.

[12] The United States Supreme Court has grounded the concept of falsity
on the historical definition of falsity in common-law libel. In *Masson,
supra* at 516-517, the Court said:

> The common law of libel takes but one approach to the question
> of falsity, regardless of the form of the communication. It over-

Therefore, if the gist of an article or the sting of the charge is "substantially accurate," the defendant cannot be liable. *Fisher v Detroit Free Press, Inc*, 158 Mich App 409, 414; 404 NW2d 765 (1987), cited with approval in *Butcher v SEM Newspapers, Inc*, 190 Mich App 309, 312; 475 NW2d 380 (1992). See also *Royal Palace, supra* at 56. While it is true that these cases all involved news media defendants, there is no logical reason why the substantial truth defense should not also apply in cases involving nonmedia defendants, such as this one. Similarly, there is no logical reason why the substantial truth defense should not apply in cases involving the gist or the sting of defamatory implications from statements that are literally true, again such as this one.

IV. THE RELATIONSHIP BETWEEN MATERIAL FALSITY AND FAULT

With this overview in mind, we now address the interplay between the material falsity and fault elements of a defamation cause of action. Hawkins asserts that summary disposition based on the substantial truth doctrine is inappropriate when there is a genuine issue regarding whether the hospital intentionally misrepresented the reason for her dismissal.

---

looks minor inaccuracies and concentrates upon substantial truth. . . . The essence of that inquiry, however, remains the same whether the burden rests upon plaintiff or defendant. Minor inaccuracies do not amount to falsity so long as "the substance, the gist, the sting, of the libelous charge be justified." . . . Put another way, the statement is not considered false unless it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." [Citations omitted.]

As the Michigan Supreme Court observed in *Rouch, supra* at 260, although *Masson* pertained to the falsity component of an actual malice determination, it is clear that the constitutional requirement for testing falsity mirrors Michigan's common-law test.

We disagree. As noted above, in *Rouch, supra* at 251-253, the Michigan Supreme Court approached the material falsity and fault questions as separate and distinct components of its analysis. In *Rouch*, the resolution of the material falsity question turned on the application of the substantial truth doctrine. *Rouch, supra* at 261-271. This authoritative example convinces us that the question whether a statement is substantially true is to be examined *independently* from the question of the level of fault. The circuit court was exactly correct, therefore, when it ruled that the issue whether a statement was made negligently or intentionally "is independent of the question of material falsity to which the 'substantial truth doctrine' is applicable."

### V. APPLICATION OF THE SUBSTANTIAL TRUTH DOCTRINE

We disagree, however, with the circuit court's conclusion that the hospital was entitled to summary disposition on the basis of the substantial truth doctrine. As noted above, the heart of Hawkins' cause of action stems from the June 2, 1995, release as read in conjunction with the May 31, 1995, release. Hawkins argues that the third paragraph of the June 2, 1995, release incorrectly implies that she was discharged because of her involvement in the medication overdose. The circuit court concluded that summary disposition was warranted because this implication was substantially true. We respectfully disagree.

The June 2, 1995, release failed to mention that Hawkins was not discharged because of her involvement in administering the overdose, but rather because of her failure to admit that she was a participant in the May 23, 1995, conversation concerning Dr.

Brandt. Looking at the evidence in a light most favorable to Hawkins, *Quinto, supra* at 362, it was erroneous to conclude as a matter of law that the implication created by the June 2, 1995, release would have the same effect on the mind of the audience as would a statement accurately identifying the reasons underlying the discharge. Without any mention of the actual justification for the discharge, the clear implication raised by the June 2, 1995, release is that the hospital discharged Hawkins for her involvement in the administration of the overdose. See *Memphis Publishing Co v Nichols*, 569 SW2d 412, 419-420 (Tenn, 1978) (observing that identified material omissions in a newspaper article had raised a clear and erroneous implication of an adulterous relationship).

The hospital's assertion that Hawkins could have been discharged because of her actions both during and after the overdose is irrelevant and, indeed, tends to obscure the real issue. The fact of the matter is that the hospital did *not* discharge Hawkins for her involvement in the overdose. Further, there is no evidence that the hospital even *attempted* to discharge Hawkins for her involvement in the overdose. We refuse to be drawn into an argument about whether the hospital could have fired Hawkins for her involvement in the overdose or whether Hawkins was more culpable than the other health-care providers involved. This is not the proper forum for resolving those issues. Moreover, lying about having participated in a conversation, the alleged conduct for which Hawkins may have been fired, is far different conduct than negligence in administering medication to a patient. Thus, the statements at issue by the hospital cannot by any reasonable analysis fall into the

"substantial truth" rubric discussed in *Rouch*. Certainly, it is no defense to liability for defamation based on false implication that the plaintiff has committed other, substantially unrelated, misconduct. That one has made a mistake, or even committed intentional wrongdoing, in one context does not justify a false implication about the person in another context.

Summary disposition was therefore inappropriate under MCR 2.116(C)(10) because there were and are genuine issues of material fact and the hospital was not entitled to judgment as a matter of law. We reverse and remand for proceedings consistent with this opinion. We do not retain jurisdiction. Hawkins, being the prevailing party, may tax costs pursuant to MCR 7.219.