**GRANT FARMERS MUTUAL FIRE AND LIGHTNING INSURANCE COMPANY, Complainant and Appellant,**

v.

**STATE of North Dakota, By and Through the State Tax Commissioner, Kent CONRAD, Respondent and Appellee.**

**Civ. No. 10527.**

Supreme Court of North Dakota.

March 29, 1984.

Zuger & Bucklin, Bismarck, for complainant and appellant; argued by Thomas O. Smith, Bismarck.

Carla J. Smith and Albert R. Hausauer, Asst. Attys. Gen., State Tax Dept., State

Capitol, Bismarck, for respondent and appellee; argued by Carla J. Smith. Appearance by Kathryn Heitkamp, Bismarck.

GIERKE, Justice.

The question in this case is whether or not Grant Farmers Mutual Fire and Lightning Insurance Company [Grant Farmers] is exempt under Section 57–38–09(12) of the North Dakota Century Code from paying State income and business and corporation privilege taxes for the taxable years 1974 through 1979.[1] Grant Farmers appeals from a judgment of the District Court of Burleigh County affirming an order of the State Tax Commissioner finding the company not exempt. We affirm.

Grant Farmers is a county mutual insurance company which was incorporated on July 1, 1905, pursuant to the provisions of Chapter 14, Article 8, § 3134 of Revised Codes of North Dakota (1895), to engage in the business of selling fire and lightning insurance. Although Grant Farmers commenced its operation as a township mutual insurance company in five adjoining townships in Ward County, its present territory of operation encompasses a ten-county area. In 1962, Grant Farmers amended its articles of incorporation to expand the types of insurance it may issue,[2] and during the years involved in this case it was engaged in the business of insurance as authorized by the provisions of Chapter 26–15, N.D.C.C.[3]

Grant Farmers voluntarily filed tax returns in 1980 and paid income taxes due for taxable years 1977, 1978 and 1979. At the request of the Tax Commissioner, Grant Farmers also filed returns and paid the taxes due for taxable years 1974, 1975 and 1976. Following an audit of the company's returns, the Tax Commissioner served a notice of determination and assessment for business and corporation privilege taxes for the years 1974 through 1979, which were thereafter paid by Grant Farmers.

In 1981, Grant Farmers requested a refund of all taxes, interest, and penalties paid to the Tax Commissioner asserting that it was a tax-exempt organization pursuant to § 57–38–09(12), N.D.C.C. The request for a refund, which totaled $17,039 exclusive of interest and penalties, was denied on February 4, 1982.

On October 21, 1982, Grant Farmers filed an administrative complaint against the Tax Commissioner. The matter was submitted by stipulation to a hearing officer, and on March 29, 1983, the Tax Commissioner entered his findings of fact, conclusions of law and decision denying Grant Farmers' request for a refund. Grant Farmers appealed to the district court, which affirmed the Tax Commissioner's decision in a judgment entered on July 20, 1983. Grant Farmers has appealed from that judgment.

Our review of an administrative agency decision involves a three-step process whereby we determine whether or not the findings of fact are supported by a preponderance of the evidence, the conclusions of law are sustained by the findings of fact, and the decision is supported by the conclusions of law. Section 28–32–19, N.D.C.C.; *Satrom v. N.D. Workmen's Compensation Bureau*, 328 N.W.2d 824, 829

---

1. Section 57–38–09, N.D.C.C., was substantially amended by the Legislature in 1983. *See* § 1, Ch. 631, 1983 S.L. The amendment is effective only for taxable years beginning after December 31, 1982. *See* § 2, Ch. 631, 1983 S.L. Thus, in this case we are concerned only with § 57–38–09, N.D.C.C., as it existed prior to the 1983 amendment.

2. The amendment states:
   "The general business of this corporation shall be the transaction of fire, lightning, cyclone, windstorm, tornado, hail, except upon growing crops, any hazard upon any risk on livestock, explosion, except the explosion of steam boilers and flywheels, riot, riot attending strike, civil commotion, air-craft, vehicles, smoke to the property of the insured, theft, vandalism, malicious mischief, water damage and-freezing, or all such forms of insurance upon the County Mutual Insurance Plan."

3. Chapter 26–15, N.D.C.C., was repealed by the 1983 Legislature. *See* § 26, Ch. 332, 1983 S.L. The laws governing organization and operation of county mutual insurance companies are presently codified in Chapter 26.1–13, N.D.C.C. *See* § 13, Ch. 332, 1983 S.L.

(N.D.1982). We do not make independent findings of fact or substitute our judgment for that of the agency, but determine only whether or not a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record. *Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214, 220 (N.D.1979). In reaching this determination, we look to the record compiled before the administrative agency rather than to the findings of the district court. *Asbridge v. North Dakota State Highway Com'r*, 291 N.W.2d 739, 743 (N.D.1980). Decisions of administrative agencies on questions of law are fully reviewable by our court. *State Hospital v. N.D. Employment Security Bureau*, 239 N.W.2d 819, 822 (N.D.1976); *In Re Sales & Use Tax Determination By State Tax Commissioner*, 225 N.W.2d 571, 576 (N.D. 1974).

The claimant of a tax exemption has the burden of establishing his exempt status, and a tax-exemption statute will receive a strict construction against the claimant. *United Power Ass'n v. Board of County Commissioners*, 300 N.W.2d 36, 39 (N.D.1980); *Butts Feed Lots v. Board of County Commissioners*, 261 N.W.2d 667, 672 (N.D.1977); *North Dakota Society for Crippled Children & Adults v. Murphy*, 94 N.W.2d 343, 345 (N.D.1959). However, words describing the object of a tax exemption will be given a liberal, and not a harsh or strained construction, in order to obtain a reasonable result effectuating the legislative intent in providing a tax exemption. *United Power Ass'n, supra; Lutheran Campus Council v. Board of County Com'rs, Ward Co.*, 174 N.W.2d 362, 365–366 (N.D.1970).

Section 57–38–09(12), N.D.C.C., as it existed during the taxable years involved in the instant case, provided:

"*57–38–09. Other organizations not subject to tax.*—The following organizations shall be exempt from taxation under this chapter:

 *       *       *       *       *       *

12. Farmers', and other mutual hail, cyclone, or fire insurance companies, mutual ditch or irrigation companies, mutual or cooperative telephone companies, or like organizations of a purely local character, the income of which consists solely of assessments or fees collected from members for the sole purpose of meeting expenses; ..."

We first address Grant Farmers' argument that § 57–38–09(12), N.D.C.C., should be interpreted as providing a tax exemption for any county mutual operating in accordance with Chapter 26–15, N.D.C.C. In order to understand the basis for this assertion, a brief discussion of the history of the laws regarding the organization and operation of county mutuals is necessary.

## I

County mutual insurance companies have been authorized to do business in one form or another in this State since North Dakota was a part of Dakota Territory. *See* §§ 3083–3102 of the Compiled Laws of the Territory of Dakota (1887). The county mutual organizational statutes have been amended on numerous occasions, culminating in Chapter 26–15, N.D.C.C., which was in effect during the taxable years at issue in the instant case. Most of the amendments have had the effect of expanding both the territorial limits of a county mutual's area of operations [*see* § 1, Ch. 77, 1890 S.L.; Ch. 121, 1905 S.L.; § 1, Ch. 188, 1913 S.L.; §§ 1 and 8, Ch. 172, 1915 S.L.; § 1, Ch. 210, 1945 S.L.; § 1, Ch. 191, 1955 S.L.; § 4, Ch. 256, 1975 S.L.] and the types of coverage a company is authorized to provide [*see* § 1, Ch. 211, 1945 S.L.; § 1, Ch. 215, 1947 S.L.; § 1, Ch. 194, 1953 S.L.; § 1, Ch. 212, 1965 S.L.].

Since its enactment in 1923, § 57–38–09(12), N.D.C.C., has remained virtually unchanged until the 1983 amendment. *See* § 27, Ch. 312, 1923 S.L.

Grant Farmers asserts that when the exemption statute was initially passed in 1923, the lines of insurance referred to in the statute were the only lines of insurance which county mutuals could write under

the then-existing organizational statutes. Therefore, Grant Farmers contends, even though the Legislature has expanded the ability of county mutuals to engage in business while leaving the exemption statute intact, it intended to exempt all county mutuals so long as they were organized and operated in accordance with the organizational provisions. However, we are not persuaded that Grant Farmers' interpretation is correct. It rests on the improper assumption that the Legislature, in enacting the exemption statute in 1923, intended a blanket exclusion of all county mutuals operating in accordance with the organizational statutes in effect at the time of enactment.

In 1919, the Legislature exempted from income tax "[i]nsurance companies ... organized and operated for mutual purposes and without profit; ..." Section 11, Ch. 224, 1919 S.L. In 1923 the Legislature amended the 1919 law, eliminating this provision and enacting the exemption statute at issue in this case. *See* §§ 2 and 27, Ch. 312, 1923 S.L. Thus, it would appear that by removing the blanket exemption for insurance companies organized and operated for mutual purposes and enacting the exemption statute with its limiting language, the Legislature intended to narrow the exemption to include only a limited class of county mutuals.[4]

Had the Legislature intended that all county mutuals be entitled to tax-exempt status, it easily could have done so by express reference to the organizational provisions and by deletion of the limiting language contained in the exemption statute. While the Legislature through the years has expanded the ability of county mutuals to do business, the above-stated considerations, including the fact that the Legislature left the exemption statute unchanged, evinces an intention that only those county mutuals which choose to bring themselves within the express provisions of the exemption statute should be entitled to tax-exempt status.

We conclude that the provisions of Chapter 26–15, N.D.C.C., do not alter the essential characteristics required to enable a county mutual to obtain an exemption under § 57–38–09(12), N.D.C.C.

## II

In order to qualify for an exemption under the express terms of § 57–38–09(12), N.D.C.C., the company must meet each of the following requirements: (1) be a farmers' or other mutual hail, cyclone and fire insurance company; (2) be of a purely local character; (3) have income which consists solely of assessments or fees collected from members; and (4) use such income for the sole purpose of meeting expenses.

The Tax Commissioner's findings of fact reveal the following: Grant Farmers, during the applicable taxable years, conducted business in a ten-county area and provided various types of insurance, such as fire, lightning, windstorm, cyclone, tornado, and hail; including a multiple peril endorsement covering vandalism and malicious mischief; hazards on livestock; water and steam damage; freezing of plumbing, heating and air conditioning systems; and theft and robbery. In addition, Grant Farmers has issued policies of insurance covering property located within the platted limits of an incorporated municipality. Since 1974,

---

**4.** It might be argued that the general exemption for insurance companies organized and operated for mutual purposes and without profit was not intended to apply to county mutuals because the 1919 exemption laws also contained a provision similar to § 57–38–09(12), N.D.C.C. Section 11, Ch. 224, 1919 S.L., provided:

"Sec. 11. There shall not be taxed under this Act any income received by any

\*　　\*　　\*　　\*　　\*　　\*

"Tenth. Farmers' or other mutual hail, cyclone, crop, fire or life insurance company, mutual or co-operative telephone company, or

like organization, the income of which consists solely of assessments, dues and fees collected from members for the sole purpose of meeting its expenses; ..."

A comparison of the 1919 and 1923 exemptions again reveals the Legislature's intention to narrow, rather than to expand, the exemption for county mutuals. The 1923 enactment sets forth fewer lines of insurance a company may provide and adds the limiting proviso that an organization be "of a purely local character." Section 27, Ch. 312, 1923 S.L.

the income of the company has consisted primarily of membership fees, premiums collected in advance from policyholders, reinsurance proceeds, and income from investments.[5] Grant Farmers does not collect prorated assessments to cover losses, but collects a premium in advance that is calculated to cover operating and other administrative expenses as well as possible casualty losses that may be incurred. Part of the premium is applied toward a reserve fund. The company also accepts memberships for insurance from persons who have insurable property in the ten-county area regardless of where the person may reside.

Our court has never construed the exemption provision at issue in this case.

However, the language of the statute is virtually identical to related provisions of the Federal revenue acts in effect at the time, [*see* Federal Revenue Act of 1921, Ch. 136, § 231(10), 42 Stat. 227, 253 (1923); Federal Revenue Act of 1918, Ch. 18, § 231(10), 40 Stat. 1057, 1076 (1919); Federal Revenue Act of 1916, Ch. 463, § 11(a)(10), 39 Stat. 756, 767 (1917)], and thus Federal court interpretations of those provisions serve as a helpful guide.

In *Commercial Health & Accident Co. v. Pickering*, 281 F. 539, 542 (S.D.Ill.1922), the court stated that in enacting the exemption provision, Congress intended "to exempt certain activities, wholly local, neighborhood, or co-operative societies, and

5. The Tax Commissioner compiled the following figures:

"FINDINGS OF FACT

*     *     *     *     *     *

"11. The net premiums (gross premiums, less returned premiums and reinsurance premiums paid) Grant Farmers collected and had available for its use for the years involved in this action amounted to:

| 1974 — $113,605 | 1977 — $133,187 |
| 1975 — $126,217 | 1978 — $152,729 |
| 1976 — $129,713 | 1979 — $159,603 |

"12. Grant Farmers participates in a reinsurance program whereby it distributes the risks it has insured with other insurers in exchange for a percentage or portion of the premiums it has collected from the insured. The reinsurance payments made during the years involved in this action amount to:

| 1974 — $26,391 | 1977 — $51,348 |
| 1975 — $26,519 | 1978 — $42,152 |
| 1976 — $44,970 | 1979 — $53,627 |

"13. Grant Farmers receives reinsurance proceeds from companies and sources with which it has reinsurance programs. Such proceeds are received whenever a loss occurs which both Grant Farmers and the reinsureres [*sic*] had insured. For some of the years involved in this action the reinsurance proceeds received amounted to:

1974 — $ 1,154
1975 — $    428
1976 — $77,625

"14. Grant Farmers received income from investments for the years involved in this action in the following amounts:

1974—$32,376 equal to 22.18% of total income
1975—$33,856 equal to 21.15% of total income
1976—$43,334 equal to 25.04% of total income

1977—$47,494 equal to 26.29% of total income
1978—$54,424 equal to 26.27% of total income
1979—$71,961 equal to 31.08% of total income

"15. Grant Farmers' investments in mortgage loans, government obligations and bank deposits during some of the years involved in this action amounted to:

| 1974 — $570,000 (+) | 1977 — $718,381 |
| 1975 — $630,000 (+) | 1978 — $822,862 |
| 1976 — $659,259     | 1979 — $914,865 |

"16. Grant Farmers paid out remittances to cover losses of insured for some of the years involved in this action in the following amounts:

1974—$ 57,346
1975—$ 84,720
1976—$199,237

"17. In addition to remittances paid out to cover losses and reinsurance costs, Grant Farmers incurred operating expenses, including investment expenses. However, the amounts received by Grant Farmers, including premiums, memberships [*sic*] fees, reinsurance reimbursements, investment income and minor miscellaneous income (i.e. salvage), greatly exceeded the amounts paid out by Grant Farmers for losses, reinsurance, operating and investment expenses. The excess receipts for some of the years involved in this action amounted to:

1974—$72,215
1975—$55,985
1976—$34,782"

According to the Tax Commissioner's findings of fact, county mutual insurance companies are not subject to tax on excess premiums collected over losses incurred, but pay income tax only on that portion of their investment income that exceeds investment expenses.

such as were not mainly engaged in pursuits for pecuniary profit, but were social, educational, or philanthropic in their purposes."[6] The court in *Hardware Underwriters et al. v. U.S.*, 65 Ct.Cl. 267, 284, *cert. denied*, 278 U.S. 645, 49 S.Ct. 81, 73 L.Ed. 559 (1928), added that the words "purely local character" referred to "organizations whose business is confined to a locality, whose subscribers come from that locality."

It was also held in *American Exchange Underwriters, Etc. v. U.S.*, 68 Ct.Cl. 36, 43 (1929), that where a portion of a company's income was interest on invested capital, surplus and reserve, and where amounts collected as premiums and dues were for reserve and surplus, the company did not qualify under the exemption statute because its income did not consist " 'solely of assessments, dues, and fees collected from members for the sole purpose of meeting expenses.' " *See also Hardware Underwriters, supra.* Other cases in which courts construed similar provisions are collected and discussed in Annot., 146 A.L.R. 454, 488–495 (1943).

These cases establish that the Federal exemption provision was intended to apply only to those county mutual insurance companies whose sole purpose is to provide protection for its members at approximate cost. In such organizations, the cost of insurance is defrayed by assessments or payments to meet losses and expenses, and the consideration and accumulation of large reserves is not involved. The exemption statute was not intended to apply to county mutuals which, although operating consistent with the provisions of the organizational statutes, operate in a manner closely resembling major insurance companies.

Although Grant Farmers' operations may have been well within the confines of Chapter 26–15, N.D.C.C., we conclude, as did the district court and the Tax Commissioner, that the company does not come within the scope and meaning of § 57–38–09(12), N.D.C.C. The facts reveal that the lines of insurance provided by Grant Farmers are much broader than those allowed by the exemption statute. Its "purely local character" is indeed questionable in view of the fact that insurance policies are sold to anyone regardless of where they reside, providing the person's property is located within the ten-county area. Further, Grant Farmers' income is not limited to fees or assessments to cover actual losses incurred plus operating expenses. The company's income consists of membership fees, advance premiums, and substantial income from investments. We agree with the Tax Commissioner's observation that this income exceeded what was needed to cover actual losses and ordinary operating expenses directly related to the collection of assessments and payment of losses, and was intended to provide funds to cover estimated future losses, operating and investment expenses, funds for participation in a reinsurance program, funds for establishment of a permanent loss fund, and funds for investment purposes. Laudable and prudent as these purposes may have been from a commercial viewpoint, they are not within the concept of the exemption statute, which is to allow favorable tax treatment for companies which provide protection to their members at cost.

We have carefully reviewed the record in this case and conclude that the Tax Commissioner's findings of fact are supported by a preponderance of the evidence, the conclusions of law are sustained by the

---

**6.** In *Pickering, supra,* 281 F. at 543, the court added:

"At the time of the enactment of these laws 'farmer's or other mutual * * * companies * * * telephone companies,' or the like, 'of a purely local character,' were numerous, and the mere naming of one of them was its most perfect description, which was well known and fully understood to mean a local mutual telephone company, such as a farmers' party line with its little exchange, neighborhood anti-horse thief societies, the local farmers' insurance societies, and the like. Such expressions did not include a general life, health, and accident insurance company organized under a general law and doing a general business throughout an entire state, ..."

findings of fact, and the decision is supported by the conclusions of law.

The judgment is affirmed.

ERICKSTAD, C.J., and SAND, PEDERSON and VANDE WALLE, JJ., concur.