*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JERRY REIGHARD,

        Plaintiff-Appellant,

v

ESPN, INC., and DANIEL MURPHY,

        Defendants-Appellees.

FOR PUBLICATION
May 12, 2022
9:20 a.m.

No. 355053
Isabella Circuit Court
LC No. 2019-015498-CZ

Before: BOONSTRA, P.J., and M. J. KELLY and SWARTZLE, JJ.

PER CURIAM.

In this defamation action, plaintiff Jerry Reighard (Reighard) appeals by right the trial court's order granting defendants' motion for summary disposition under MCR 2.116(C)(10). We affirm in part, reverse in part, and remand for further proceedings.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

For 35 years, Reighard was the head women's gymnastics coach at Central Michigan University (CMU). On February 20, 2019, CMU announced that it had placed Reighard on paid administrative leave pending an investigation. No details regarding the investigation were disclosed in that announcement. However, citing confirmation by CMU's athletic director, multiple news articles reported on that date that the investigation had "nothing to do with [former gymnastics physician] Larry Nassar's case or sexual misconduct of any kind"[1] or "Title IX"[2].

---

[1] See *People v Nassar*, unpublished per curiam opinion of the Court of Appeals, issued December 22, 2020 (Docket No. 345699) (indicating that Larry Nassar, a physician at Michigan State University and the team physician for USA Gymnastics, pleaded guilty to multiple counts of criminal sexual conduct based on his sexual abuse of dozens of teenage and prepubescent girls).

[2] See 20 USC 1681 et seq.

Defendant Daniel Murphy is a reporter for defendant ESPN, Inc. In that capacity, Murphy had previously reported on issues relating to gymnastics, including coverage of Nassar's sexual abuse of gymnasts and John Geddert's reported physical and mental abuse of gymnasts.[3] Indeed, Murphy's reporting in 2018 regarding the Nassar sexual abuse scandal has earned him and his ESPN colleagues multiple awards—including an IRE[4] Award for Sports Investigations and a Peabody Award.[5] Murphy also has co-authored a book entitled: *Start by Believing: Larry Nassar's Crimes, the Institutions that Enabled Him, and the Brave Women Who Stopped a Monster.* According to Murphy, the book refers to Geddert as one of the individuals who enabled Nassar.

On February 21, 2019, Murphy posted on Twitter[6] consecutive tweets about two public announcements concerning women's gymnastics coaches in Michigan. The first tweet referred to an announcement by the Michigan attorney general:

> Michigan's attorney general announced today her office is taking over an investigation of John Geddert, the 2012 Olympic team head coach and close friend of Larry Nassar. Several gymnasts have publicly abused [sic] Geddert of physically and mentally harming them.

The second tweet—which was posted within a minute of the first tweet—addressed CMU's announcement concerning Reighard:

> On the same day as the AG's announcement, Central Michigan said it was putting longtime gymnastics coach Jerry Reighard on leave amid an internal review. No details of the review were shared, but Reighard has a long personal and professional relationship with Geddert.

Reighard requested a retraction of the tweets. Murphy then searched for and discovered the earlier reporting in which CMU had confirmed that its investigation of Reighard had nothing to do with Nassar or Title IX. Murphy also then spoke directly with a CMU representative, who again confirmed to Murphy that the investigation had nothing to do with Nassar or Title IX, and that by "Title IX," he meant "sexual misconduct." Following that conversation, Murphy concluded that a retraction was unnecessary because there was nothing factually incorrect in the tweets. Instead, on March 11, 2021, he posted an additional tweet—which he testified was not

---

[3] John Geddert was head coach of the 2012 gold-medal U.S. women's gymnastics Olympic team. He died by suicide in 2021 after being charged with multiple counts of criminal sexual assault and human trafficking, including of minors. See, e.g., https://www.espn.com/olympics/gymnastics/story/_/id/30969557/court-documents-detail-deceased-coach-john-geddert-alleged-abuse (last accessed April 18, 2022).

[4] Investigative Reporters and Editors. See https://www.ire.org (last accessed April 15, 2021).

[5] See https://peabodyawards.com (last accessed April 15, 2021).

[6] Murphy's Twitter account advertised his then-forthcoming book.

meant as a retraction, but instead was intended to "add more information to [his] reporting"—on Twitter:

> Central Michigan hopes to have its internal investigation of Jerry Reighard completed by the end of the semester. An athletic dept. spokesman confirmed today Reighard remains on paid leave and the investigation is not connected to the Larry Nassar scandal or sexual misconduct.

Reighard filed suit, alleging that Murphy's initial tweets constituted defamation per se and false light invasion of privacy.[7] After defendants answered the complaint, discovery ensued. Murphy testified at his deposition that, before publishing the tweets, confidential sources had informed him that Reighard had been placed on administrative leave, that Reighard, like Geddert, had a reputation for physically and mentally abusing gymnasts, and that Geddert and Reighard had a longstanding and friendly relationship. To verify the information, Murphy read CMU's announcement placing Reighard on administrative leave pending an investigation. He also reviewed a 2012 news article indicating that Reighard and Geddert had a professional relationship and that they were friendly with each other. He testified that it was important that he perform due diligence to confirm what he had been told, and that due diligence was important because "[i]t's my job." He also testified that his purpose was to establish a relationship between Reighard and Geddert.

Murphy indicated that, based on what he had learned, he believed there might be a connection between the attorney general's announcement regarding the investigation into Geddert and CMU's announcement regarding its investigation into Reighard. In his view, his two initial tweets properly raised that question. He indicated that at the time of his tweets, he had no information suggesting that Reighard was "connected to Larry Nassar and Geddert in any sexual abuse scandal" or that Reighard had been accused of any kind of sexual abuse "in a criminal sense." He acknowledged that, in his first tweet, he established a relationship between Nassar and Geddert, and in his second tweet, he established a relationship between Geddert and Reighard. But he denied that his tweets had linked the three men. Despite the reference to Nassar in the first tweet,

---

[7] The complaint did not include an express count for defamation by implication. However, the complaint did allege that, by posting the tweets, defendants were "attempting to connect [Reighard] to individuals in the gymnastics community who have been accused of physically and mentally abusing student-athletes." It further alleged that "Defendants' statement implies that [Reighard] was placed on administrative leave due to similar behavior engaged in by Mr. Nassar and of which Mr. Geddert has been accused of." Consequently, the parties litigated the case as setting forth a claim for defamation by implication. Indeed, in moving for summary disposition, defendants described the defamation by implication claim as Reighard's "main claim," and Reighard described it as the "heart" of his case. On remand, the trial court should order any amendment of the pleadings it deems necessary to squarely allege, in accordance with the parties' interpretation and litigation of the existing complaint, a claim of defamation by implication.

he testified that he did not believe the thread raised any question as to whether the investigation into Reighard was related to Nassar or sexual-abuse allegations.

Murphy also testified, however, that he had not attempted to contact Reighard or CMU's athletic director before posting his tweets, because "[t]he information I needed was in a public press release." He also testified that he had not seen the earlier news reports confirming that there was no connection between the investigation of Reighard and sexual misconduct of any kind or the sexual-abuse scandal concerning Nassar. He testified that he did not know whether, had he known that information, he would have tweeted as he did. He indicated that he did not know whether it would have been important to include that information in his tweets, and that he could not say or control how anyone might read them.

Defendants moved for summary disposition under MCR 2.116(C)(10), arguing that the tweets did not assert any defamatory or materially false facts, that they did not constitute defamation by implication, and that Reighard—a limited-purpose public figure—could not demonstrate that Murphy had acted with actual malice. Reighard responded that the tweets contained materially false facts[8] and that they had implied that he was guilty of physical and sexual abuse like Geddert and Nassar. He also argued that he was not a limited-purpose public figure, but that even if he were, Murphy had acted with actual malice when posting the tweets.

Following a hearing, the trial court granted defendants' motion, concluding there were no genuine issues of material fact regarding Reighard's defamation and false light claims because the tweets were substantially true and, even if they were not, Reighard was a limited-purpose public figure and there was no evidence that Murphy had acted with actual malice.[9] Reighard moved for reconsideration, arguing that the trial court had failed to address his claim for defamation by implication. The trial court denied the motion. This appeal followed.

## II. STANDARD OF REVIEW

Reighard argues that the trial court erred by granting defendants' motion for summary disposition. This Court reviews de novo a trial court's decision on a motion for summary disposition and whether the trial court properly applied the constitutional standard for defamation. *Redmond v Heller*, 332 Mich App 415, 438; 957 NW2d 357 (2020). Summary disposition under MCR 2.116(C)(10) is appropriate when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." "A genuine issue of material fact exists when the record leaves open an issue upon

---

[8] For example, Reighard contended that he never had a personal relationship with Geddert. And Reighard pointed out that the CMU announcement (concerning Reighard) did not occur "on the same day" as the attorney general's announcement (concerning Geddert and Nassar), as the tweets had temporally linked them; instead, the CMU announcement had been made the day before the attorney general's announcement. Those issues are not before us on appeal.

[9] On appeal, defendants contend that summary disposition was appropriate because Reighard cannot establish a claim for defamation per se. The trial court, however, did not grant summary disposition on that basis. Consequently, we do not address that particular argument further.

which reasonable minds might differ." *Johnson v Vanderkooi*, 502 Mich 751, 761; 918 NW2d 785 (2018) (quotation marks, citation, and alteration omitted). The trial court must consider the "pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party." *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008).

## III. ANALYSIS

### A. DEFAMATION AND THE FIRST AMENDMENT

The law of defamation lies at a crossroads with that of the First Amendment. The First Amendment, of course, protects, in part, freedom of speech and freedom of the press. US Const, Am I ("Congress shall make no law . . . abridging the freedom of speech, or of the press.").[10]

The law of defamation arises—as a matter of state common law—from the world of tort. It seeks to protect against injury to reputation caused by the publication of falsehoods:

> A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. [3 Restatement Torts, 2d, §559 at 156.]

Thus, "[a] communication is defamatory if it tends to lower an individual's reputation in the community or deters third persons from associating or dealing with that individual." *Ireland v Edwards*, 230 Mich App 607, 614; 584 NW2d 632 (1998). "However, not all defamatory statements are actionable." *Id*. Generally, "[i]f a statement cannot be reasonably interpreted as stating actual facts about the plaintiff, it is protected by the First Amendment." *Id*. See also *Milkovich v. Lorain Journal Co,* 497 US 1, 20; 110 S Ct 2695; 111 L Ed 2d 1 (1990). "Thus, at least some expressions of opinion are protected." *Ireland*, 230 Mich App at 614, citing *Milkovich*, 497 US at 18–20. Otherwise, a plaintiff can establish a defamation claim by showing:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. [*Smith v Anonymous Joint Enterprise*, 487 Mich 102, 113; 793 NW2d 533 (2010) (quotation marks and citation omitted).]

The quandary lies in determining at what point the law of defamation abridges freedom of speech or of the press.

---

[10] The First Amendment applies to the states by virtue of the Fourteenth Amendment. US Const, Am XIV.

## 1. THE STARTING POINT

The starting point for that analysis is how the framers of the First Amendment perceived its interaction with the common law of defamation. As Justice WHITE stated in *Gertz v Robert Welch, Inc*, 418 US 323; 94 S Ct 2997; 41 L Ed 2d 789 (1974) (WHITE, J., dissenting):

> For some 200 years—from the very founding of the Nation—the law of defamation and right of the ordinary citizen to recover for false publication injurious to his reputation have been almost exclusively the business of state courts and legislatures. Under typical state defamation law, the defamed private citizen had to prove only a false publication that would subject him to hatred, contempt, or ridicule. Given such publication, general damage to reputation was presumed, while punitive damages required proof of additional facts. The law governing the defamation of private citizens remained untouched by the First Amendment because until relatively recently, the consistent view of the Court was that libelous words constitute a class of speech wholly unprotected by the First Amendment, subject only to limited exceptions carved out since 1964. [*Id*. at 369-370.]

## 2. *NEW YORK TIMES* AND ITS PROGENY

In 1964, the United States Supreme Court issued its seminal decision in *New York Times Co v Sullivan*, 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964). It adopted an "actual malice" test for defamation claims brought by public officials relating to criticism of their official conduct:

> The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not. [*Id*. at 279-280.]

That test has since been expanded to public figures. See *Curtis Publishing Co v Butts*, 388 US 130; 162; 87 S Ct 1975; 18 L Ed 2d 1094 (1967). The Court in *Gertz* described public figures as follows:

> Respondent's characterization of petitioner as a public figure raises a different question. That designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions. [*Gertz*, 418 US at 351.]

## B. DEFAMATION BY IMPLICATION

A subset of the tort of defamation is known as "defamation by implication." "[A] cause of action for defamation by implication exists in Michigan, but only if the plaintiff proves that the

defamatory *implications* are materially false." *Hawkins v Mercy Health Services, Inc*, 230 Mich App 315, 330; 583 NW2d 725 (1998). See also *Locricchio v Evening News Ass's*, 438 Mich 84, 122; 476 NW2d 112 (1991); *American Transmission, Inc v Channel 7 of Detroit, Inc*, 239 Mich App 695, 702; 609 NW2d 607 (2000). "[S]uch a cause of action might succeed even without a direct showing of any actual literally false *statements.*" *Hawkins*, 230 Mich App at 330. Liability for defamation by implication may be imposed based not on what is affirmatively stated, but on what is implied when a defendant "juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts [such that] he may be held responsible for the defamatory implication." Prosser & Keeton, Torts (5th ed), § 116, p 117. "A defamation by implication stems not from what is literally stated, but from what is implied." *White v Fraternal Order of Police*, 909 F2d 512, 518 (DC Cir, 1990).

## C. APPLICATION

On appeal, Reighard argues that, even if the statements in Murphy's tweets were not themselves materially false, the implications arising from the statements were false. He further argues that there was sufficient evidence of actual malice to survive summary disposition. We agree, in part.

### 1. THE IMPLICATIONS

As noted, the tweets, which were published on February 21, 2019, stated:

> Michigan's attorney general announced today her office is taking over an investigation of John Geddert, the 2012 Olympic team head coach and close friend of Larry Nassar. Several gymnasts have publicly abused [sic] Geddert of physically and mentally harming them.

> On the same day as the AG's announcement, Central Michigan said it was putting longtime gymnastics coach Jerry Reighard on leave amid an internal review. No details of the review were shared, but Reighard has a long personal and professional relationship with Geddert.

Reighard identifies two allegedly defamatory implications in the tweets. First, that there was a connection between CMU's decision to place him on administrative leave and the attorney general's investigation into the allegations that Geddert had physically and mentally harmed gymnasts. Second, that there was a connection between Reighard being placed on administrative leave and Nassar or sexual-abuse allegations.

### 2. CAPABLE OF DEFAMATORY MEANING

"[A] court may decide as a matter of law whether a statement is actually capable of defamatory meaning." *Ireland*, 230 Mich App at 619 (citation omitted). "Where no such meaning is possible, summary disposition is appropriate." *Id.* "A communication is defamatory if, considering all the circumstances, it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."

*Id.*

Although the trial court held, on reconsideration, that the tweets "[did] not create a clear implication that plaintiff committed the same kind of sexual abuse crimes as Nassar," it did not address whether the alleged implications, if proven, were capable of defamatory meaning. Plaintiffs argue that the tweets could reasonably be interpreted as connecting Reighard with sexual abuse allegations. Defendants disagree. We agree with Reighard.

The first tweet identified Geddert as the head coach of the 2012 Olympic team and that he was close friends with Nassar. At the time, it was well-known that Nassar had been the team physician for USA Gymnastics and had treated many gymnasts in his role as a physician at Michigan State University. The second tweet identified Reighard as CMU's "longtime gymnastics coach" and stated that Geddert and Reighard are also friends. Thus, reading the tweets in context, a reasonable reader could infer that all three men had been involved in gymnastics and were friends with each other.

Next, the first tweet stated that the attorney general was taking over an investigation into allegations that Geddert had physically and mentally harmed several gymnasts. Further, by mentioning Geddert's close association with Nassar, the tweet arguably implied a connection between the investigation into Geddert and Nassar's sexual-abuse convictions. The second tweet links to the first by referencing the attorney general's investigation. It then noted that Reighard had been placed on administrative leave pending an internal review. It stated that no details of the review were shared by CMU; however, by using the word "but" in its final sentence, the tweet arguably implied that the reason Reighard was placed on administrative leave was related to a supposedly long, personal and professional relationship with Geddert. In doing so, a reasonable reader could read the tweets as implying that Reighard had engaged in the same type of misconduct for which the attorney general was criminally investigating Geddert—physically and mentally harming gymnasts. Further, a reasonable reader could conclude that Reighard was or could have been involved in sexual misconduct or in the Nassar sexual-abuse scandal.

We conclude, particularly in light of the manner in which the statements contained within the tweets were juxtaposed with one another, that the implications complained of are capable of defamatory meaning. See *Ireland*, 230 Mich App at 619-620. The implication that Reighard's placement on leave was related to allegations that Geddert had physically and mentally harmed gymnasts tended to harm Reighard's reputation so as to lower him in the estimation of the community or deter third persons from associating or dealing with him. That assessment is even more true with respect to the second alleged implication, i.e., that Reighard's placement on leave was related to Nassar or sexual abuse allegations. This is not so strained a reading of the tweets as to make summary disposition appropriate. Rather, we conclude that it is one that a reasonable jury should assess. Thus, these statements are actionable.[11]

---

[11] We reject defendants' suggestion that the tweets at most raised a question, and that questions are not capable of defamatory meaning. First, the tweets did not pose a question. Second, "a blanket protection of defamation liability for any and all questions is inappropriate," *Boulger v Woods*, 917 F 3d 471, 480 (CA 6, 2019), just as it is inappropriate when statements are couched in terms of opinion, *Milkovich,* 497 US at 19 ("[s]imply couching such statements in terms of

3. FALSITY

In another context, this Court has observed that "claims of defamation by implication, which by nature present ambiguous evidence with respect to falsity, face a severe constitutional hurdle." *Locricchio*, 438 Mich at 122. That is only partially true in this case, however.[12]

To analyze this element or Reighard's defamation-by-implication claim, we will separately analyze each of the complained-of implications. With regard to the first implication, i.e., that there was a connection between CMU's investigation of Reighard and the attorney general's investigation of Geddert (for alleged physical and mental abuse),[13] Reighard has failed to put forth any evidence. Rather, he merely asserts that it is false, without directing this Court to the factual basis for his conclusion. In doing so, he has abandoned the issue. See *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959) ("It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position."). Moreover, it is undisputed that CMU ultimately fired Reighard for misconduct related to instructing gymnasts to conceal symptoms of injuries from physicians so that the gymnasts could be cleared to compete notwithstanding their injuries. This undisputed conduct relates to the physical or mental abuse of gymnasts. Because that was also the reported basis of the attorney general's investigation of Geddert, we conclude that there is no triable issue with regard to the falsity of this alleged implication. There thus was no record evidence refuting the alleged implication that CMU placed Reighard on leave for reasons related to the investigation of Geddert (for allegedly physically and mentally harming gymnasts). Consequently, the implication was not, as a matter of law, materially false, and summary disposition on this claim of defamation by implication was therefore proper.

---

opinion does not dispel these implications"). Finally, based on our independent review of the totality of the evidence, the tweets raised not mere questions but actionable implications that reasonably should be assessed by the fact-finder. Defendants' interpretation would effectively negate an entire area of Michigan jurisprudence—defamation by implication—an invitation that we decline.

[12] In *Philadelphia Newspapers v Hepps*, 475 US 767; 106 S Ct 1558; 89 L Ed 2d 783 (1986), the Supreme Court held that "the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern." *Id*. at 777. In other words, it fashioned "a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages." *Id*. at 776. See also *Milkovich*, 497 US at 16; *Rouch v Enquirer & News of Battle Creek Michigan*, 440 Mich 238, 259; 487 NW2d 205 (1992) ("In contrast to the early common law, where falsity was presumed and the defendant was required to prove substantial truth as a defense, the burden of proving falsity has now been shifted to the plaintiff."), citing *Hepps*, 475 US at 768-769.

[13] We note that while Geddert ultimately was charged with crimes involving sexual abuse, nothing to that effect was reflected in either the attorney general's announcement or Murphy's tweets.

The same cannot be said, however, with regard to the second implication, i.e., that there was a connection between Reighard being placed on administrative leave and Nassar or sexual-abuse allegations. Indeed, the falsity of that implication is uncontested. Moreover, the evidence reflects that CMU confirmed on February 20, 2021—as reported by multiple news outlets at that time—that its investigation into Reighard was not connected to Nassar or allegations of sexual abuse. Moreover, when Murphy contacted CMU after being asked to retract his tweets, he was provided with the same information. Reighard has therefore satisfied the "falsity" element with respect to the second complained-of implication.

We note that, in granting summary disposition in favor of defendants, the trial court concluded in part that the "gist" of the statements contained in the tweets was accurate. However, the trial court at that time was considering only the factual statements expressly set forth in the tweets. In subsequently denying Reighard's motion for reconsideration, the trial court reiterated that it had previously found that the gist of Murphy's tweets was accurate. The trial court's language derives from what is known as the "substantial truth defense." As our Supreme Court stated in *Rouch v Enquirer & News of Battle Creek Michigan*, 440 Mich 238; 487 NW2d 205 (1992):

> The common law has never required defendants to prove that a publication is literally and absolutely accurate in every minute detail. For example, the Restatement of Torts provides that "[s]light inaccuracies of expression are immaterial provided that the defamatory charge is true in substance." [*Id.* at 258-259, citing 3 Restatement Torts, 2d, §581, comment f, p 237.]

The Court in *Rouch* further noted that, notwithstanding that *Hepps* had shifted the burden of proof (of falsity) to the plaintiff, the definition of falsity, based on common-law doctrine, remained as set forth in *Masson v New Yorker Magazine, Inc,* 501 US 496; 111 S Ct 2419; 115 L Ed 2d 447 (1991):

> The common law of libel takes but one approach to the question of falsity, regardless of the form of the communication. . . . It overlooks minor inaccuracies and concentrates upon the substantial truth. . . . The essence of that inquiry, however, remains the same whether the burden rests upon plaintiff or defendant. Minor inaccuracies do not amount to falsity so long as "the substance, the gist, the sting, of the libelous charge be justified." . . . Put another way, the statement is not considered false unless it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." [*Rouch*, 440 Mich at 260, citing *Masson*, 501 US at 516-517 (citations omitted in original).]

We further note that this Court has stated that "there is no logical reason why the substantial truth defense should not apply in cases involving the gist or the sting of defamatory implications from statements that are literally true." *Hawkins*, 230 Mich App at 333.

That said, we conclude in the circumstances of this case that the second implication complained of by Reighard, i.e., that there was a connection between Reighard being placed on administrative leave and Nassar or sexual-abuse allegations, would, if proved, "have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson*,

-10-

501 US at 517. Consequently, any implication that Reighard was placed on administrative leave for reasons related to Nassar or sexual abuse allegations was false, and the trial court erred, with respect to this alleged implication, to the extent it granted summary disposition on the basis of the "gist" or substantial truth of the statements contained in the tweets.

## 4. LIMITED-PURPOSE PUBLIC FIGURE

The trial court held that Reighard was a limited-purpose public figure. And, as the trial court noted, many courts indeed have classified sports figures, including coaches, as public figures (or limited-purpose public figures) by virtue of their positions, at least with regard to comments concerning their positions. Reighard has now stipulated to limited-purpose-public-figure status.[14]

## 5. ACTUAL MALICE

Because Reighard has been deemed to be a limited-purpose public figure, he must also establish by clear and convincing evidence that Murphy made the allegedly defamatory implication with actual malice. See *Ireland*, 230 Mich App at 615. Of course, in the defamation context, "actual malice" does not refer to a defendant's motive or any sense of ill will in the ordinary sense of the term. See *Harte-Hanks Communications, Inc v Connaughton*, 491 US 657, 666-667 and n 7; 109 S Ct 2678; 105 L Ed 2d 562 (1989) ("The phrase 'actual malice' is unfortunately confusing in that it has nothing to do with bad motive or ill will."). Rather, as explained in *Ireland*,

> Actual malice is defined as knowledge that the published statement was false or as reckless disregard as to whether the statement was false or not. Reckless disregard for the truth is not established merely by showing that the statements were made with preconceived objectives or insufficient investigation. Furthermore, ill will, spite or even hatred, standing alone, do not amount to actual malice. "Reckless disregard" is not measured by whether a reasonably prudent man would have published or would have investigated before publishing, but by whether the publisher in fact entertained serious doubts concerning the truth of the statements published. [*Ireland*, 230 Mich App at 622 (quotation marks and citation omitted).]

See also *Harte-Hanks*, 491 US at 688 ("In a case such as this involving the reporting of a third party's allegations, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.") (citation and internal quotation omitted); *Grebner v Runyon*, 132 Mich App 327, 337; 347 NW2d 327 (1984) ("[T]here was a genuine issue as to whether MegaMedia, in fact, entertained serious doubts concerning the truth of the statements published and whether the failure to make a phone call verifying the report amounted to reckless disregard as to the truthfulness of the report. We find that this matter should have been left to the trier of fact. Where the credibility of a witness or deponent is crucial, summary judgment should

---

[14] In response to defendants' motion for summary disposition, Reighard argued that he was not a limited-purpose public figure. The trial court, however, disagreed, and Reighard expressly does not contest that conclusion on appeal.

not be granted.  Plaintiff's allegations were sufficient to withstand a motion for summary judgment.").

Thus, " 'actual malice' is a subjective concept." *Smith*, 487 Mich at 115.  It "mandates a subjective inquiry concentrating on the knowledge of a defendant at the time of a publication." *Ireland*, 230 Mich App at 305.  However, a defendant will not automatically prevail in a defamation case by stating that the statements were made with a belief that they were true, because a defendant's state of mind may be established "through circumstantial evidence."  *Smith*, 487 Mich at 115-116.  Moreover, "[a]lthough failure to investigate will not alone support a finding of actual malice . . . the purposeful avoidance of the truth is in a different category."  *Harte-Hanks*, 491 US at 692 (citation omitted).

The actual malice test is further complicated in this case by the fact that Reighard's claim is one of defamation-by-implication.  This Court has said (albeit in the analogous false light invasion of privacy context) that when the plaintiff's injury arises from an allegedly harmful implication, the plaintiff must prove by clear and convincing evidence that the defendant "intended or knew of the implications that the plaintiff is attempting to draw . . . ."  *Battaglieri v Mackinac Ctr for Pub Policy*, 261 Mich App 296, 305; 680 NW2d 915 (2004) (quotation marks and citation omitted).  See also *Royal Palace Homes, Inc*, 197 Mich App at 56 (stating that a defendant is not responsible for every defamatory implication that may be drawn from a report of true facts, unless evidence is presented that the defendant intended the defamatory implication).

But what does it mean to "intend" the implication?  Delving a bit deeper into the authorities relied on by these cases answers the question.  In short, just as "actual malice" means either knowledge or recklessness with regard to *falsity*, so too, "intended" in this context means either knowledge *or recklessness* with regard to the *implication*.  See, e.g., *Saenz v Playboy Enterprises, Inc*, 841 F2d 1309, 1318 (CA 7, 1988) (stating that the plaintiff must show that "the defendants either intended *or were reckless* with regard to the potential falsity of defamatory inferences which might be drawn from the article") (emphasis added).  That is, "[n]ot only must the plaintiff establish that the statement is susceptible of a defamatory meaning which the defendants knew to be false or which the defendants published with reckless disregard for its potential falsity, but also that the defendants intended to imply *or were reckless* toward the implications.  *Id*. (emphasis added; footnote omitted).  Stated another way, "the communicative-intent element of actual malice in defamation-by-implication cases can be satisfied by reckless disregard for the defamatory meaning of a statement."  *Kendall v Daily News Pub Co*, 716 F 3d 82, 91 (CA 3, 2013).  See also *White*, 909 F2d at 519 ("It is no defense that the defendant did not actually intend to convey the defamatory meaning, so long as the defamatory interpretation is a reasonable one.").

To satisfy that element in this case, Reighard directs this Court to Murphy's deposition testimony.  Specifically, Murphy testified that when he wrote the tweets, he did not know—one way or the other—whether there had been allegations of sexual abuse against Reighard, and that he did not believe at the time that there was "any connection with sexual abuse" between Reighard, Geddert, and Nassar.  That indeed would seem to establish that Murphy lacked awareness as to whether it was true that there was a connection between Reighard and Nassar or any sexual-abuse allegations.  It may even suggest that he did not subjectively believe that the alleged implication was true.  It does not, however, answer the question whether Murphy intended to convey, or was reckless in conveying, the implication.

-12-

We conclude, however, that there is adequate circumstantial evidence for this question to be decided by the fact-finder. As noted, for example, by using the word "but" in the final sentence of the second tweet, Murphy seemed to imply that Reighard was placed on administrative leave for reasons that were related to a supposedly long, personal and professional relationship with Geddert. And those assertions were neatly juxtaposed with an immediately-preceding statement establishing a personal relationship between Geddert and Nassar. Moreover, while acknowledging that due diligence was an essential part of his job, and therefore that it was necessary for him to verify the information he had learned, he pointedly did not attempt to contact either Reighard or CMU's athletic director before posting his tweets, and he did not do even the minimal due diligence that would have alerted him to the fact that CMU had already confirmed—as had been publicly reported—that its investigation of Reighard had nothing to do with Nassar or any sexual misconduct allegations.

We recognize that "failure to investigate the accuracy of a communication before publishing it" is not alone sufficient to establish actual malice. *Smith*, 487 Mich at 117.[15] However, "a 'purposeful avoidance of the truth' is dissimilar from the mere 'failure to investigate,' and 'a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity' of a publication is sufficient to find reckless disregard." *Id.*, citing *Harte-Hanks*, 491 US at 692. In this case, in the totality of the circumstances and based on our independent review of the entire record, we conclude from the juxtaposition of the statements contained in the successive tweets, the use and positioning of the word "but" in the final sentence of the second tweet, and Murphy's failure to perform even basic due diligence—notwithstanding his acknowledgement of his professional duty to do so—to explore the accuracy of what we deem to be a reasonable interpretation of the defamatory implication of the tweets, that a reasonable fact-finder could find by clear and convincing evidence that Murphy had conveyed the implication of his tweets with actual malice. Indeed, our conclusion is perfectly in line with that of the Supreme Court in *Harte-Hanks*, which found that the record evidence—including the newspaper-defendant's failure to interview an important witness and failure to listen to an available tape recording of an interview of the witness, was—just as had been true in *Curtis Publishing*—" 'unmistakably' sufficient to support a finding of actual malice." *Harte-Hanks*, 491 US at 692-693.

Accordingly, we reverse the trial court's order granting summary disposition in favor of defendants with respect to the second complained-of defamatory implication.

---

[15] Citing *Harte-Hanks*, 491 US at 665, the trial court noted (and defendants argue on appeal) that "even an 'extreme departure from professional standards' by a reporter would not constitute actual malice." However, the Supreme Court in *Harte-Hanks* used that language not to sanction extreme departures from professional standards of reporting, but rather simply to point out that it derived from the standard that a plurality of the Court had proposed for public figures in *Curtis Publishing*, which had been rejected by a majority of the Justices in favor of an extension of the *New York Times* "actual malice" standard.

## 6. FAULT

Because—as the fact-finder will on remand be instructed— the elements of a defamation claim include "fault amounting at least to negligence on the part of the publisher," *Smith*, 487 Mich at 113, liability will not be imposed in this case absent a showing of "fault," see *Gertz*, 418 US at 347. That issue is therefore properly left to the fact-finder.

## D. FALSE LIGHT INVASION OF PRIVACY

Because Reighard's defamation and false light invasion of privacy claims are governed by the same legal standards, see *Ireland*, 230 Mich App at 624-625, we similarly reverse in part the trial court's order granting summary disposition on Reighard's false light invasion of privacy claim.

## IV. CONCLUSION

For all of the reasons stated, we affirm in part and reverse in part the trial court's order granting summary disposition in favor of defendants, and remand for further proceedings consistent with this opinion. We do not retain jurisdiction. No costs are awarded, neither party having prevailed in full. MCR 7.219(A).

/s/ Mark T. Boonstra
/s/ Michael J. Kelly
/s/ Brock A. Swartzle