*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CHAPPELLE DEVELOPMENT COMPANY and
SCOTT CHAPPELLE,

        Plaintiffs-Appellants,

v

EAST LANSING INFO, ALICE DREGER, and
ELIOT SINGER,

        Defendants-Appellees.

UNPUBLISHED
February 16, 2023

No. 359463
Ingham Circuit Court
LC No. 21-000539-CB

Before: PATEL, P.J., and BORRELLO and SHAPIRO, JJ.

PER CURIAM.

In this defamation action, plaintiffs Chappelle Development Company and Scott Chappelle appeal by right the trial court's order granting summary disposition in favor of defendants East Lansing Info and Alice Dreger. For the reasons stated in this opinion, we affirm.

## I. BACKGROUND

Chappelle is a real estate developer and the president of Chappelle Development Company, which does business as Strathmore Real Estate Group. In 2002, Chappelle became involved in a project in downtown East Lansing to develop blighted property. The project was originally known as City Center II, and later became known as the "Park District project." The City of East Lansing ("the city") issued over five million dollars in bonds to buy properties in support of the project. Ultimately, the project fell through, and in 2015 the downtown properties owned by Chappelle went into foreclosure.

Dreger is an East Lansing resident who opposed the city entering into development deals with Chappelle. At some point, she founded East Lansing Info ("ELi"), which owns and operates the web domain eastlansinginfo.news. Dreger and ELi have relied on the research of Eliot Singer, a citizen investigator, in reporting on Chappelle and his prior development projects.

On June 4, 2020, the Department of Justice (DOJ) issued a press release announcing that a federal grand jury had returned an indictment charging Chappelle with "tax evasion, filing false

-1-

documents with the Internal Revenue Service (IRS), making false statements to IRS Criminal Investigation (IRSC-CI) agents, and mortgage fraud[.]" The release goes on to explain that Chappelle operated real estate development companies, including Strathmore, and that he was being charged with failing "to pay over to the IRS employment taxes that were withheld from the wages of the companies' employees" and making false statements to the IRS to evade payment of the unpaid taxes. In addition, Chappelle was charged with making false statements and submitting fraudulent documents to a bank when refinancing his lake house mortgage.

On the same day as the DOJ press release, Dreger authored and published an ELi article titled, "East Lansing Real Estate Developer Scott Chappelle Indicted for Tax and Bank Fraud." After reciting the charges in the opening paragraph, the article provides a history of Chappelle's East Lansing development project. The article is reproduced in relevant part below, with the alleged defamatory statements emphasized:

> *Chappelle is known to many in East Lansing as the developer whose actions caused prolonged blight in East Lansing's downtown at the northwest corner of Abbot Road and Grand River Avenue* – an area now being redeveloped by a company which bought the properties Chappelle's company lost to foreclosure.

> For years, *citizen watchdogs warned the City of East Lansing that Chappelle's dealings were mired in failures and questionable practices.* The most dogged of these was Eliot Singer, a folklorist by profession.

> In 2014, as City staff, Council, and the [the Downtown Development Authority (DDA)] continued to make deals with Chappelle for the project first known as "City Center II" and then the "Park District Project," Singer provided extensive material to ELi to help shine light on Chappelle's track record.

> Reached with today's news, Singer told ELi, "About 7 or 8 years ago, *I shared with the FBI numerous documents that looked like mortgage fraud to a lay person. Since nothing came of this, I assumed sophisticated legal tricks were at work and the transactions could not be prosecuted.*"

> *In the City Center II/Park District saga, Chappelle's maneuvers included making minor children co-owners of the Park District Investment Group (PDIG)*, claiming that further questions could not be asked by the public about ownership of that company because children were now involved.

> In 2015, the downtown properties in East Lansing owned by Chappelle's company went to a foreclosure auction. The current development company, DRW, bought the properties and proceeded to work out a deal with the City of East Lansing for redevelopment.

> *Then, Chappelle stepped in and effectively killed the deal* in September 2017 *with a claim he still had rights to tax credits related to the properties.*

> In 2018, *DRW got around this through what has generally been presumed to be an unspecified pay-off of Chappelle*, an action that angered many who were fed up

with Chappelle, but that was appreciated by those who wanted redevelopment to finally happen.

Today, the Abbot and Graduate Hotel are under construction. *But thanks to Chappelle, the DDA is saddled with over $5 million in debt on properties along Evergreen Ave. that it purchased to support Chappelle's project.* [Emphasis added.[1]]

The article concludes with additional quotes from the DOJ press release regarding the charges against Chappelle.

Two days later, on June 6, 2020, Dreger published an essay on the website publicresponse.com, titled, "Will The Chappelle Indictment Change City Hall?" The essay is reproduced in part below, with the alleged defamatory statements again emphasized:

It's painful that Jim Cuddeback, the founder of Public Response, is not alive to read the news that real estate developer Scott Chappelle has been indicted for tax and bank fraud. When it was impossible for citizen watchdogs to convince any local new organization to report the truth about Chappelle's history, Public Response provided the space to educate the community.

*Eliot Singer, above all, worked doggedly to track and expose what was really going on with the developer* with whom the City was looking to partner [with] in the biggest public-private real estate deal to ever hit East Lansing. *I expect that if we could see the origins of the federal indictment, we would find Eliot's research.*

But about that, even Eliot would say – who knows? There were so many people who knew what was really going on. And it never seemed to matter.

*Again and again, citizens tried to get City Council, City staff, and the DDA to look at what we'd found. Again and again, we were treated as if were naïve, stupid, whiny, obsessive NIMBY's.*

\* \* \*

I have to wonder what the enablers of Chappelle are thinking today. My experience with them suggests they have always believed they took action at just the right time.

But the truth is that if City leaders had taken us [at] all seriously, and stopped averting their eyes from documented research, they might have saved the City several years of blight and millions of dollars. [Emphasis added.]

---

[1] Many of the disputed statements are followed by hyperlinks to prior ELi articles; the links have been omitted for readability.

Singer posted two comments to Dreger's essay outlining the history of his investigatory efforts into Strathmore and the City Center II project. Singer stated in part: "I still have no idea what is technically legal, but should not be, and prosecutable fraud. Most of the stuff in the indictment I had noted years ago, but as I told [Dreger], when nothing came of it, I assumed [it] was the usual big boys get away with gaming the system at our expense."

When plaintiffs filed the instant defamation suit, Singer issued a retraction and apology to Chappelle and Strathmore for essays and comments Singer had made on publicresponse.com and eastlansinginfo.news. Singer stated, in part, that he did not possess any evidence or knowledge that Chappelle or his companies "engaged in illegal or corrupt acts, in connection with City Center II or any other business activity" and that he did not intend for readers to reach that conclusion or draw such inferences. After Singer was dismissed as a defendant, plaintiffs filed an amended complaint alleging defamation per se against Dreger and ELi on the basis of the alleged defamatory statements emphasized above. Plaintiffs also alleged defamation by implication, asserting that the intended implication of the publications was that "[t]he current indictment against Chappelle stems from a continuing course of criminal conduct which Defendants have been exposing for years." Plaintiffs also alleged false-light invasion of privacy, trade libel, and tortious interference with business relationships.

In lieu of filing an answer, defendants moved for summary disposition under MCR 2.116(C)(8) (failure to state a claim) and (C)(10) (no genuine issue of material fact). Defendants attached multiple documents to their motion, including: the federal indictment, Lansing State Journal (LSJ) articles, city council meeting minutes, a history of the Park District project prepared by city staff, and a statement from the Michigan Economic Development Corporation (MEDC) regarding the status of tax credits for the project. Relying on these documents, defendants argued that the alleged defamatory statements were substantially true and protected by the fair-reporting privilege, MCL 600.2911(3). Defendants also argued that some of the disputed statements amounted to expression of subjective opinion or were otherwise not capable of defamatory meaning.

In response to the motion for summary disposition, plaintiffs argued that the publications were capable of defamatory meaning and that defendants intended for readers to draw a nonexistent connection between the federal indictment and Dreger's prior reporting. Plaintiffs further argued that the publications falsely implied that Chappelle had a history of criminal acts and fraud. Plaintiffs concluded that the publications were not protected by the fair-reporting privilege and that the "gist" of the publications was not substantially true.

After hearing oral argument, the trial court granted summary disposition to defendants under MCR 2.116(C)(8). The court took judicial notice of the documents attached to defendants' motion to determine whether the disputed statements were privileged for fair and true reports of public matters. Doing so, the court concluded that each alleged defamatory statement was either substantially true or not capable of defamatory meaning. Regarding the defamation-by-implication claim, the court determined that the publications, even when read it totality, did not imply that the indictment stemmed from the East Lansing project or that plaintiffs had a long history of criminal conduct and fraud. The court acknowledged that the publications were "self-congratulatory on the part of" defendants, but concluded that this did not amount to defamation

-4-

against plaintiffs. The court also concluded that the other tort claims were subject to the same defenses as the underlying defamation claim.

## II. DISCUSSION

## A. DEFAMATION

Plaintiffs argue that the trial court erred by granting summary disposition of their defamation claims. We disagree. The trial court correctly concluded that the alleged defamatory statements were either substantially true or not capable of defamatory meaning. The court also correctly determined that the alleged defamatory implications are not actionable.

As initial matter, we agree with plaintiffs that because the trial court went outside the pleadings and relied on documents submitted by defendants, we must evaluate the trial court's decision as having been granted under MCR 2.116(C)(10). See e.g., *Cuddington v United Health Servs, Inc*, 298 Mich App 264, 270; 826 NW2d 519 (2012). The court specifically relied on these documents to determine whether the alleged defamatory statements were true or substantially true, which is a question of fact,[2] see e.g., *American Transmission, Inc v Channel 7 of Detroit, Inc*, 239 Mich App 695, 703; 609 NW2d 607 (2000), and summary disposition on this basis must be reviewed under MCR 2.116(C)(10). However, we conclude that even when defendants' motion is evaluated under MCR 2.116(C)(10), summary disposition was proper.[3] See *Sabbagh v Hamilton Psychological Servs*, PLC, 329 Mich App 324, 345; 941 NW2d 685 (2019) ("[W]e will affirm the trial court's grant of summary disposition in favor of defendants, as long as it was the correct result, albeit for the wrong reason.").

"The elements that must be established to sustain a defamation claim are (1) a false and defamatory statement regarding the plaintiff, (2) a communication to a third party that is not privileged, (3) fault on the part of the publisher that amounts to at least negligence, and (4) either special harm caused by the publication or actionability of the statement regardless of special harm, otherwise known as defamation per se." *Cetera v Mileto*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 356868); slip op at 4. "Whether a statement is actually capable of defamatory

---

[2] The trial court apparently determined that it could consider the documents under MCR 2.116(C)(8) because they were "public records" that it could take judicial notice of under MRE 201. However, "[m]erely because [a] fact may be subject to proof by judicial notice does not change the basic proposition that [it] is indeed a fact question." *Robinson v Emmet Co Rd Comm*, 72 Mich App 623, 641-642; 251 NW2d 90 (1976).

[3] Under MCR 2.116(C)(10), summary disposition is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "The court must consider the affidavits, pleadings, depositions, admissions, and other documentary evidence submitted by the parties in the light most favorable to the party opposing the motion." *Liparoto Const, Inc v Gen Shale Brick, Inc*, 284 Mich App 25, 29; 772 NW2d 801 (2009). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West*, 469 Mich at 183.

meaning is a preliminary question of law for the court to decide." *Ghanam v Does*, 303 Mich App 522, 544; 845 NW2d 128 (2014). "A communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Reighard v ESPN, Inc*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No 355053); slip op at 5 (quotation marks and citation omitted). "To be considered defamatory, statements must assert facts that are provable as false." *Ghanam*, 303 Mich App at 545, quoting *Milkovich v Lorain Journal Co*, 497 US 1, 19; 110 S Ct 2695; 111 L Ed 2d 1 (1990). Expressions of opinion that cannot be interpreted as stating actual facts about the plaintiff are protected by the First Amendment. *Edwards v Detroit News, Inc*, 322 Mich App 1, 13; 910 NW2d 394 (2017). Statements amounting to "rhetorical hyperbole, imaginative expressions, or exaggerations designed to be offensive" are also not actionable. *Redmond v Heller*, 332 Mich App 415, 443; 957 NW2d 357 (2020).

Aside from whether a statement is capable of defamatory meaning, "[t]ruth is an absolute defense to a defamation claim." See *TM v MZ*, 326 Mich App 227, 242; 926 NW2d 900 (2018). Under the substantial-truth doctrine, "it is not necessary for defendants to prove that a publication is literally and absolutely accurate in every minute detail." *Collins v Detroit Free Press, Inc*, 245 Mich App 27, 33; 627 NW2d 27 (2001) (quotation marks and citation omitted). "Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance." *Rouch v Enquirer & News of Battle Creek Mich (After Remand)*, 440 Mich 238, 258-259; 487 NW2d 205 (1992) (quotation marks and citation omitted). Courts look "to the sting of the article to determine its effect on the reader; if the literal truth produced the same effect, minor differences [are] deemed immaterial." *Hawkins v Mercy Health Servs, Inc*, 230 Mich App 315, 332; 583 NW2d 725 (1998).[4]

---

[4] Related to the substantial-truth doctrine is the fair-reporting privilege contained in MCL 600.2911(3), which the trial court relied on in this case. MCL 600.2911(3) provides in part that

> [d]amages shall not be awarded in a libel action for the publication or broadcast of a fair and true report of matters of public record, a public and official proceeding, or of a governmental notice, announcement, written or recorded report or record generally available to the public, or act or action of a public body, or for a heading of the report which is a fair and true headnote of the report.

It is clear that MCL 600.2911(3) applies to defendants' reporting of the charges contained in the federal indictment, but plaintiffs do not challenge defendants' statements relating to the indictment. Instead, plaintiffs take issue with the recounting of Chappelle's failed development efforts and his alleged "questionable practices." Defendants have submitted documents to show that these statements were substantially true. However, it is questionable whether defendants should be deemed—retroactively—to have been reporting on these "public records" for purpose of MCL 600.2911(3). For these reasons, we decline to decide whether the fair-reporting privilege applies in this case and instead will review the trial court's ruling on the basis of the substantial-truth doctrine.

In this case, plaintiffs allege both defamatory statements and defamatory implications. We will first address the alleged defamatory statements contained in the ELi article. We will then address the Public Response essay and plaintiffs' defamation-by-implication claim.

## 1. ALLEGED DEFAMATORY STATEMENTS

"A plaintiff claiming defamation must plead a defamation claim with specificity by identifying the exact language that the plaintiff alleges to be defamatory." *Sarkar v Doe*, 318 Mich App 156, 184; 897 NW2d 207 (2016) (quotation mark, citation and omitted). The "statements must be viewed in context to determine whether they can reasonably be understood as stating actual facts about the plaintiff." *Ireland v Edwards*, 230 Mich App 607, 618; 584 NW2d 632 (1998).

As noted, after announcing the charges contained in the indictment as described by the DOJ press release, the ELi article recounts Chappelle's development efforts regarding the downtown East Lansing project. What follows is an analysis of the alleged defamatory statements in that article, beginning with the first disputed statement:

> Chappelle is known to many in East Lansing as the developer whose actions prolonged blight in East Lansing's downtown at the northeast corner of Abbot Road and Grand River Avenue.[5]

We agree with plaintiffs that this statement is capable of defamatory meaning, i.e., an assertion that Chappelle prolonged blight tends to harm his reputation in the community. However, defendants maintain that this statement is substantially true. They rely, in part, on a 2016 LSJ article about the new property developer that discusses Chappelle under a subheading, "A history of failed development." The article provides:

> In 2002, developer Scott Chappelle began work on the Museum Place project, which would have brought a mix of housing, office and retail space to the corner of Grand River Avenue and Abbot Road. He wanted it to be the new home for the state archives and the Michigan State University Museum.
>
> "There were always questions of funding going forward," [Mayor Mark] Meadows said. "Every one of (Chappelle's) plans were never really going to come to fruition."

---

[5] Plaintiffs also allege that the following caption to the article's opening photograph of the blighted corner is defamatory: "The blight downtown lasted years before Chappelle's company finally lost the properties to foreclosure. Today, new building rise in this location, and Chappelle has been indicted." The parties dispute whether this statement implies that Chappelle caused the blight that "lasted for years." But even if it does, this implication is duplicative to the statement expressly asserting that Chappelle's actions "prolonged blight in East Lansing's downtown." Accordingly, we need only address the latter statement.

The state withdrew from the project in 2007. MSU followed suit in 2008.

The plans would be revised numerous times before being put on hold during the recession. By 2012, the city had terminated its agreement with Chappelle.

"It was twice where a site plan had been approved where the project did not move forward," said Nathan Triplett, who served on council from 2009 to 2015 and as mayor from 2013 to 2015. "After a few requests for an extension, the city council determined it was not viable."

Plaintiffs do not dispute that the project failed because of a lack of financing, but they attribute this to the global financial crisis around that time. They have provided an affidavit from Strathmore's former general counsel, Thomas Eckhardt, attesting to this and also attributing the project's delay to the public partners insisting that the project have a cultural component. On this basis, plaintiffs dispute that it was Chappelle's actions that prolonged the blight.

There were undoubtedly various factors that contributed to the project's failure, which culminated after many years. But regardless, it was Chappelle's project and it is therefore difficult to conceive how plaintiffs could prove that none of his actions contributed to the project's delay and ultimate failure. In any event, defendants identify a concrete action taken by Chappelle that delayed the development of the blighted property, and that is Chappelle's objections to the transfer of tax credits to the new developer. This argument pertains to another alleged defamatory statement in the ELi article:

Chappelle stepped in and effectively killed the deal [with DRW, the new developer,] in September 2017 with a claim he still had rights to tax credits related to the properties . . . DRW got around this through what has generally been presumed to be an unspecified pay-off to Chappelle.

Defendants argue that by not initially transferring the tax credits, Chappelle effectively prolonged the downtown blight.

In support of this position, defendants have provided a 2017 statement from the MEDC explaining that the tax credits for the former City Center II project belonged to the former developer, i.e., Chappelle, and needed to be transferred to the new developer for the project to move forward. Plaintiffs, for their part, do not dispute that Chappelle impeded the new developer by claiming that he still had a right to the tax credits. They also do not expressly dispute that Chappelle did in fact receive payment from the new developer in exchange for the tax credits. Instead, plaintiffs maintain that Chappelle did not do anything illegal by holding on to the tax credits. The ELi article, however, does not assert or imply that Chappelle received an illegal payoff or committed any illegal act with respect to the tax credits. Indeed, the article acknowledges Chappelle's claim that "he still had rights to tax credits related to the properties." Further, phrases and terms such as "killed the deal" and "pay-off" are the types of loose, figurative or hyperbolic language on which a defamation claim cannot be based. See *Milkovich*, 497 US at 21; *Redmond*, 332 Mich App at 443. See also *Greenbelt Cooperative Publishing Ass'n, Inc v Bresler*, 398 US 6, 13-14; 90 S Ct 1537; 26 L Ed 2d 6 (1970) (holding that a real estate developer could not maintain a defamation action against a newspaper for characterizing his bargaining position as "blackmail"

because "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable.").

We agree with plaintiffs that, when read in context, the article can reasonably be read as suggesting that Chappelle's actions relating to the tax credits are part of his "questionable practices," another statement that plaintiffs claim is defamatory. Specifically, the article stated that "Citizen watchdogs warned the City of East Lansing that Chappelle's dealings were mired in failures and questionable practices," before providing specific examples of actions Chappelle took with respect to the development project. But whether something is a "questionable practice" is a subjective assertion, rather than an objectively verifiable fact. See *Ireland*, 230 Mich App at 616. And as the trial court reasoned, "questionable practices" does not necessarily imply criminal wrongdoing. So even if Chappelle did not violate any laws with respect to East Lansing project, he cannot prove that this statement is false.

To summarize, after many years Chappelle's proposed downtown project failed. It would seem to follow that, as the head of the project, at least some of Chappelle's actions contributed to the failure, and by extension, that Chappelle effectively prolonged the downtown blight. To the extent that a specific action is required, defendants have shown that Chappelle's claim to the project's tax credits impeded the development of the blighted property. Accordingly, the disputed statement that Chappelle's actions prolonged the blight was substantially true. Further, although Chappelle maintains that he was acting within his legal rights with respect to the tax credits, the article does not suggest otherwise. Terms such as "killed the deal" and "pay-off" are loose, hyperbolic language that may not support a defamation claim, and the term "questionable practices" clearly conveys a subjective opinion to a reasonable reader that is not provable as false. For these reasons, the trial court correctly determined that plaintiffs could not maintain a defamation action with respect to these statements.

Moving to the remaining alleged defamatory statements in the ELi article, plaintiffs assert that defendants are liable for publishing the following quote from Singer: "I shared with the FBI numerous documents that looked like mortgage fraud to a layperson. Since nothing came of this, I assumed sophisticated legal tricks were at work and the transactions could not be prosecuted."

Plaintiffs argue that this statement falsely asserts that Chappelle avoided prior criminal prosecution only because of "sophisticated legal tricks."

A party may be liable for publishing a defamatory quote, see Restatement (Second) of Torts § 578 (1981), but, when viewed in context, Singer's quote clearly conveys a subjective opinion rather than a factual assertion. First, the statement that the documents "looked like mortgage fraud to a layperson," strongly indicates that Singer is a lay person and thus qualifies for the reader that he is not a legal expert. Indeed, the article identifies Singer as one of the "citizen watchdogs" and a "folklorist by profession." Second, Singer merely *assumed* legal tricks were at work," which

shows that Singer is expressing an opinion—rather than an assertion of fact—that Chappelle was using legal tricks to avoid prosecution. Accordingly, this statement is not actionable.[6]

The next disputed statement identified in the amended complaint is that "[i]n the City Center II/Park District saga, Chappelle's maneuvers included making minor children co-owners of the Park District Investment Group (PDIG), claiming that further questions could not be asked by the public ownership of that company because children were now involved." Although plaintiffs alleged that this was a false and defamatory statement, they do not address it on appeal, and a 2014 LSJ article provided by defendants shows that this statement is substantially true. Accordingly, this alleged defamatory statement is without merit and has apparently been abandoned by plaintiffs.

Finally, while plaintiffs alleged that it was defamatory for the article to state that "thanks to Chappelle, the DDA is saddled with over $5 million in debt on properties along Evergreen Ave. that it purchased to support Chappelle's project," they do not dispute that the DDA incurred that amount of debt in support of Chappelle's project. Rather, they argue that the article suggests that Chappelle *unjustly* saddled the public with millions in debt. This again relates to Chappelle's contention that he has done nothing wrong with respect to the project and that the project failed because of the global financial crisis. However, considering that the incurrence of millions in public debt is a matter of public concern, any minor slight conveyed by language such as "thanks to Chappelle" and "saddled with debt" is too trivial to be capable of defamatory meaning. See *Locricchio v Evening News Ass'n*, 438 Mich 84, 119; 476 NW2d 112 (1991) ("[S]peech on matters of public concern merits heightened protection under the First Amendment."). These phrases are properly characterized as "rhetorical hyperbole, imaginative expressions, or exaggerations designed to be offensive," *Redmond*, 332 Mich App at 443, and are therefore not actionable.

In sum, the trial court correctly determined that the alleged defamatory statements identified in ELi article were either substantially true or not capable of defamatory meaning.

## 2. ALLEGED DEFAMATORY IMPLICATIONS

Plaintiffs also allege that the publications give rise to two defamatory implications: (1) that defendants' reporting of Chappelle led to the federal indictment; and (2) that Chappelle had a long history of criminal conduct and fraud.

Michigan recognizes a claim of defamation by implication. *Locricchio*, 438 Mich at 130. As explained by this Court, "a cause of action for defamation by implication exists in Michigan, but only if the plaintiff proves that the defamatory implications are materially false, and . . . that such a cause of action might succeed even without a direct showing of any actual literally false statements." *Hawkins*, 230 Mich App at 330. "It remains true, however, that claims of defamation by implication, which by nature present ambiguous evidence with respect to falsity, face a severe

---

[6] Plaintiffs also emphasize that Singer has issued a retraction. However, the retraction does not address this specific statement and instead applies generally to comments and essays that Singer has made regarding Chappelle and Strathmore over the years. Plaintiffs do not identify any legal authority suggesting that a general retraction establishes that a specific statement is defamatory.

-10-

constitutional hurdle." *Id*. Principles of general libel and First Amendment libel law also apply to these claims, as does the substantial-truth defense. *Id*. at 333.

Plaintiffs claim that the publications, including the following statements from Dreger's Public Response essay, give rise to the implication that defendants' reporting led to Chappelle's indictment:

- Eliot Singer, above all, worked doggedly to track and expose what was really going on with the developer.

- I expect that if we could see the origins of the federal indictment, we would find Eliot's research.

- Again and again, citizens tried to get City Council, City staff, and the DDA to look at what we've found. Again and again, we were treated as if we were naïve, stupid, whiny, obsessive NIMBYs.

We agree with plaintiffs that these statements could reasonably be read as suggesting that Dreger's reporting and Singer's research played a part in the federal indictment. But as the trial court correctly reasoned, self-congratulatory statements on the part of defendants do not amount to defamation against plaintiffs. Plaintiffs argue that there is no "self-congratulatory" defense to defamation, but this completely misses the point. The trial court was not recognizing such a defense but rather determined that defendants falsely taking credit for the indictment does not amount to defamation against Chappelle, i.e., it does not "tend to harm the reputation of [Chappelle] as to lower him in the estimation of the community or . . . deter third persons from associating or dealing with him." *Reighard*, ___ Mich App at ___; slip op at 5 (quotation marks and citation omitted). Clearly the indictment itself harms Chappelle's reputation, but plaintiffs fail to explain how an implication that defendants' reporting led to the indictment further harms that reputation. Accordingly, the trial court correctly determined that to the extent the publications imply that defendants' reporting led to the indictment, this implication was not defamatory.[7]

The other alleged defamatory implication of the publications is that Chappelle has a history of criminal conduct and fraud and that the indictment was merely the first time he was being criminally charged. As discussed, the factual statements in the ELi article detailing Chappelle's "questionable practices" relating to the East Lansing development project were true or substantially true. And "questionable practices" is a subjective assertion that does not necessarily equate with criminal conduct or fraud. The only statement directly suggesting that Chappelle was engaged in prior fraud or criminal conduct was the quotation from Singer that he had reviewed

_____

[7] We also note that, unlike ELi which is a media defendant, Dreger's essay on publicresponse.com is more akin to a blog or internet message board that "are generally regarded as containing statements of pure opinion rather than statements or implications of actual, provable fact." *Ghanam*, 303 Mich App at 546-547.

-11-

documents that "looked like mortgage fraud to a lay person." But for the reasons discussed, Singer was clearly expressing his opinion on this matter rather than making a provably false factual assertion.

We acknowledge that reciting Chappelle's prior "questionable practices" in the context of an article reporting on his indictment allows for speculation that Chappelle had engaged in prior criminal conduct. But as explained by Justice CAVANAGH'S concurrence in *Locricchio*, 438 Mich at 144:[8]

> [A] defamation defendant cannot be held liable for the reader's possible inferences, speculations, or conclusions, where the defendant has not made or directly implied any provably false factual assertion, and has not, by selective omission of crucial relevant facts, misleadingly conveyed any false factual implication. In sum, the overall implications that may flow from true factual statements straightforwardly presented are ordinarily as privileged for defamation purposes as the statements themselves. Any other conclusion, in my view, would unacceptably inhibit the free reporting of news and information of public concern.

We agree that it would be untenable to hold a defendant liable for speculation and inferences that may be drawn from a publication. We further conclude that this position is consistent with our holding in *Hawkins*, 230 Mich App 315, a defamatory-implication case where we reversed a grant of summary disposition to the defendant-hospital when its press releases created a "clear implication" that the hospital discharged the plaintiff-nurse for a reason that was not true. See *id*. at 334-335. In contrast, the publications in this case do not clearly imply that Chappelle had committed prior crimes. Instead, the publications can reasonably be read as implying that the indictment validates defendants' opposition to Chappelle's East Lansing development activities, regardless of whether those activities involved fraud or criminal activity. In other words, an equally permissible implication of the publications is that a public entity should not have been in business with someone who is indicted for multiple federal crimes, even if no crimes were committed in connection with the public project. Clearly one's conclusion on that matter is subjective and cannot be proven false.

In conclusion, the factual statements in the publications were true or substantially true. The juxtaposition of the reporting on Chappelle's indictment along with the history of his "questionable practices" relating to the East Lansing project may allow for speculation that Chappelle has committed other fraud or criminal acts. However, the publications do not compel that conclusion. Accordingly, there is no "clear implication" of prior criminal wrongdoing in the publications that could be proven as materially false. The trial court correctly granted summary disposition of the defamation-by-implication claim.

## B. REMAINING CLAIMS

---

[8] A concurrence is not binding on this Court but it may be considered persuasive or instructive. See e.g., *Pioneer State Mut Ins Co v Wright,* 331 Mich App 396, 411 n 5; 952 NW2d 586 (2020).

Plaintiffs also argue that the trial court erred by granting summary disposition of their remaining tort claims. However, a review of the complaint shows that plaintiffs' other alleged torts are based on the same publications and statements that plaintiffs claim to be defamatory. And it is well settled that torts that are based on defamatory statements are subject to the same defenses available to defamation claims. See *Ireland*, 230 Mich App at 624; *Lakeshore Community Hosp, Inc v Perry*, 212 Mich App 396, 401; 538 NW2d 24 (1995). Accordingly, plaintiffs' other claims fail for the same reasons their defamation claims fail, and the trial court properly granted summary disposition of these claims.

## C. DISCOVERY

Lastly, plaintiffs argue that the trial court abused its discretion by quashing plaintiffs' subpoenas and staying discovery pending the court's summary disposition decision.

As discussed, we agree with plaintiff that the trial court's ruling must be analyzed under MCR 2.116(C)(10). And "a motion under MCR 2.116(C)(10) is generally premature if discovery has not closed, unless there is no fair likelihood that further discovery would yield support for the nonmoving party's position." *Townsend v Chase Manhattan Mtg Corp*, 254 Mich App 133, 140; 657 NW2d 741 (2002).

In this case, after defendants moved for summary disposition, they also moved to quash subpoenas served by plaintiffs on Public Response and other individuals. Defendants argued, in part, that discovery should not be conducted until their motion for summary disposition was decided. At the motion hearing on discovery, plaintiffs argued that the sought discovery was necessary to respond to defendants' argument that the alleged defamatory statements were not made with actual malice. The trial court decided to stay discovery until it ruled on the motion for summary disposition, explaining that it would only grant summary disposition on the basis of questions of law and if there were no material factual disputes. Ultimately, the trial court did not need to decide whether Chappelle was a public figure such that the actual-malice standard applied because plaintiff had not alleged statements and implications that were false and defamatory.

In most cases, it would be improper for the trial court to rely on a defendant's documentary evidence in support of a MCR 2.116(C)(10) motion without allowing the plaintiff a chance to conduct discovery. However, plaintiffs have only sought discovery relating to whether Dreger was acting with actual malice, i.e., "with knowledge of [the statement's] falsity or reckless disregard of the truth." *Prysak v RL Polk Co*, 193 Mich App 1, 15; 483 NW2d 629 (1992). But this standard applies only if Chappelle is a public figure and relates to the burden of proof, which is not relevant unless the statements are capable of defamatory meaning and there is a material question of fact as to their truth. Because plaintiffs fail to explain how discovery would uncover factual support to change the trial court's conclusions on those matters, we conclude that the trial court did not abuse its discretion by staying discovery.

Affirmed.

/s/ Sima G. Patel
/s/ Stephen L. Borrello
/s/ Douglas B. Shapiro

-13-